(Nos. 20756, 20757.

ANNA KARTUN, Appellant, *vs.* ISRAEL KARTUN, Appellee.

*Opinion filed February 19, 1932—Rehearing denied April 6, 1932.*

Mishkin & Mishkin, (Roy Juul, of counsel,) for appellant.

Leslie H. Whipp, for appellee.

Mr. Commissioner Edmunds reported this opinion:

Anna Kartun filed a bill in the circuit court of Cook county naming her husband, Israel Kartun, party defendant. The bill prayed partition of certain real estate located at 1123 South Whipple street, Chicago, which Anna and Israel held under a deed conveying to them in joint tenancy, and also an accounting. The cause was referred to a master, who heard evidence and filed a report recommending that the bill be dismissed for want of equity. From a decree entered in accordance with such recommendation Anna Kartun has appealed.

The parties were married on November 11, 1919. Appellee was born in Russia and came to America when sixteen years old. He studied in evening sessions of the Chicago public schools, where he was promoted to the sixth grade, and also studied in a trade school. He served in

the United States army during the World War, receiving his citizenship papers during such service. Appellant was three years older than appellee and had a grammar school education. They lived together as husband and wife from the time of their marriage until June or July, 1928, when they ceased to cohabit although continuing to the present time to occupy the above mentioned Whipple street property. Prior to the marriage appellee had a savings account at the Schiff Trust and Savings Bank and appellant had a savings account at the West Side Trust and Savings Bank, the balance in each account at the time of the marriage being about $260. Appellee, a tailor by trade, was employed by Hart, Schaffner & Marx prior to the marriage and has since continued in the employ of that firm, his regular weekly wage being $39. He did some overtime work, however, and at times earned as much as $60 per week. The first six months of their married life the parties lived with appellant's family, paying no board. Upon commencing housekeeping they purchased some chickens and appellant occasionally sold eggs. For a number of months in 1923 and 1924 two relatives of appellant boarded with them, paying an amount alleged by her to be $10 per week each but claimed by appellee to be less than that. As hereinafter pointed out in detail, the record discloses that between 1919 and 1928 considerable sums of money were deposited in the above and other bank accounts which were subsequently opened, and withdrawals from such accounts were used in purchasing the Whipple street property as well as a number of bonds. Some of these bonds were not registered. One was registered in appellee's name and others were registered in the name of appellant.

Appellant contends that she is entitled to relief because the money which went into the purchase of the bonds, save the one registered in appellee's name, and of her interest in joint tenancy in the Whipple street property, was hers, whereas appellee's contention is that appellant is without

any rights in the premises because all of the money used to purchase the bonds and realty belonged to him. The master found that there was no fraud or misrepresentation by any of the parties to the transaction which resulted in taking the deed to the Whipple street property.

Appellant's account at the West Side Trust and Savings Bank was continued in her maiden name after her marriage. Between 1919 and 1928 the total deposits made in that account were $5922.15. On July 25, 1924, she opened an account in her name at the Schiff Trust and Savings Bank. Total deposits made in that account between that date and 1928 were $1730.82. Between 1919 and 1928 the total deposits made in appellee's account at the Schiff Trust and Savings Bank were $2604. Over sixty separate deposits were made there between the date of the marriage and 1928. In 1923 appellee opened an account at the Amalgamated Trust and Savings Bank, and between that date and 1928 total deposits made therein were $498.31. Appellee testified that all the years he was married he handed to appellant his "full pay envelopes;" that out of that she gave him back forty cents a week; that he told her to pay for her room and board and expense and to save the rest for him; that in 1926 he found out that she was making deposits to her account in the West Side bank; that there were frequent conversations about it, in the course of which she said to appellee that she was saving the money for him; that between 1919 and 1925 she told him sometimes what she was doing with the money she was receiving from the pay envelopes, always saying that she was saving it for him, and that she made all the deposits which were made to his account in the Schiff bank, including in 1920 a check for $1019.42 covering a matured endowment insurance policy. With further reference to this check appellee testified that when it came to the house appellant gave it to him to sign and then grabbed it out of his hand and said it was hers—"nothing is mine." He

further testified that he subsequently examined his bank book, which was in a bureau drawer; that he knew appellant had deposited the check in his account; that he stopped looking at his bank book after 1926, when she promised to buy bonds in his name, and that he never saw her bank book until after the Whipple street property was bought. On cross-examination appellee testified that he knew appellant had an account at the West Side bank because she told him so "always;" that she opened an account at the Schiff bank but he did not go with her, and that between the time he was married and June, 1928, he never went to the Schiff bank. On being shown a certain picture of himself and appellant he testified that he remembered going there, the bank giving a slip for a free picture for making a few dollars deposit. Jacob Silverman, manager of the bond department of the Schiff bank and who had previously been a teller there, testified that he saw appellee in the bank at various times within a few years prior to July 2, 1928, and knew him as a customer of the bank. Under subpœna *duces tecum* all the original deposit slips in connection with appellee's account at the Schiff bank were brought in. Counsel for appellee moved for leave to retire with appellee for the purpose of examining these slips, which leave was granted. After examining them appellee testified that none were in his handwriting.

Appellant's version of the arrangement between appellee and herself was quite different from that of appellee. She testified that he gave her each week an allowance of $30, more or less, depending on what his earnings were that week; that he told her it was to pay for everything needed for both of them and that if she saved anything such saving was to be hers; that he said he wanted her to economize and not be extravagant like many other women; that he gave her the allowance from his pay envelope, taking it from the envelope and then destroying the envelope; that she never gave him anything back, and that both he and

she made deposits in his Schiff bank account. Appellant described a number of respects in which she accumulated savings by practicing economy in matters of living and dress. She testified that appellee told her he was loaning money to people in his place and they returned it with big interest and that this had been going on for several years, but that he later admitted that he did not loan it that way but gave it to his family. She further testified that he gave money to members of his family, including his brother, every week, the amount being about three dollars, and that he gave $100 to pay for an operation on his father. That he gave some money to his family does not appear to be directly denied by him.

The contract to purchase the Whipple street property was drawn on May 19, 1925, in the real estate department of the Madison and Kedzie State Bank. It provided that appellee and appellant agreed to make the purchase in joint tenancy, the price to be $7500, $4000 to be paid in cash and $3500 by the giving of a mortgage. Herbert T. Yuenger, assistant trust officer of the bank, testified that either he or Charles Mishkin dictated the contract in the immediate presence of appellee. Otto A. Luthe, son of the vendor of the property, testified that he was at the bank when the contract was drawn up; that appellant and appellee were there; that the contract was dictated by Mishkin in their presence; that Yuenger read it aloud to all, and that when the deal was being closed he heard appellant and appellee talking together, what they said being that both were going to own the property. Appellant testified that before they went to the bank to have the contract drawn she and appellee were saying that they wanted the property put in both names, whereupon her brother, Charles Mishkin, a lawyer, stated that that meant joint ownership and proceeded to explain the significance of taking title that way; that she, appellee, Mishkin, Yuenger and Luthe were present at the bank; that Mishkin dictated the contract to a stenographer;

that Yuenger read it and all present heard it read twice, once by Mishkin and once by Yuenger; that it was agreed between herself and appellee that she, having made arrangements at her bank so no interest would be lost by withdrawal on the date required by the purchase contract, should advance the $4000 cash to make the payment and that appellee was to pay her $2000 "that he owed on the house" in a short time; that she did advance the $4000; that subsequently he turned over to her from his bank account $2000, telling her that it made them square on the deal, and that this money went into bonds which she purchased.

Appellee's version of the Whipple street transaction was that he located the property and "had a lawyer to close the deal;" that this lawyer was Mishkin; that Mishkin gave witness the papers to sign and did not tell him what it was all about; that witness signed the papers without knowing what was in them or "what it was all about;" that he did not see the deed at the time the deal was closed, and that appellant said to him before they entered into the contract, "I got $4000 saved up for you to buy this property." He admitted that he subsequently turned over to her $2000 out of his bank account but denied that he said it made them square on the deal, insisting that he turned over the money with the understanding that her brother was to use it to buy bonds for appellee. That appellee apparently understood the meaning of "joint tenancy" is indicated by answers made by him while under cross-examination, but he insisted that before the purchase was made he told appellant he wanted the property in his own name and she agreed to have it that way. The cash payment was made June 2, 1925, and the deed vesting appellant and appellee with title in joint tenancy was delivered on that date. It is not denied that the money which was used to make the payment then due came from appellant's account at the West Side bank. On June 29, 1925, appellant rented a safe deposit box at the Schiff bank in her

own name, the deed and other papers being kept therein and also the bonds which had been purchased from time to time.

In January of 1928 the parties had conversations with reference to appellee's alleged sterility. Shortly after that appellee demanded that he have joint access to the safe deposit box. Appellant testified that she refused to agree to this, whereupon appellee made threats that something would happen, and a few weeks later told her that unless he was given joint access to the box he would divorce her. He claimed that she willingly agreed to have him given such access. Arrangements for joint access were made June 26, 1928. On July 2 he went to the box and took out the bonds and papers which were contained therein. Upon visiting the box and finding it empty she instructed the Schiff bank not to pay the bonds or coupons, and when some of the coupons were presented by appellee they were stamped "payment stopped." On July 25 appellee's authority to open the box at the Schiff bank was revoked by appellant, and he opened a checking account at the Madison and Kedzie bank, where he cashed some of the coupons. She testified that he offered to return half of the bonds to her if she would give him a divorce, and that he twice threatened to cut her with a bread knife. These charges were denied by appellee, who testified that he had the knife in his hand for the purpose of cutting bread. In October, 1928, appellant filed a complaint in the domestic relations branch of the municipal court of Chicago charging appellee with non-support, and he was ordered to pay her $15 per week.

If the money used to pay for the Whipple street property had been handed over to the vendor by appellee directly, so far as that property is concerned we would seemingly be dealing with a phase of the ordinary case of a husband paying the consideration and having title to real property transferred to his wife. Ordinarily the existence

of a resulting trust is established by proof that one person has bought property and paid for it with his funds and has had the title conveyed to another. Where, however, a husband has bought property and had the title transferred to his wife, or a parent has bought property and had the title transferred to his or her child, a resulting trust is not shown to exist unless it is established that it was not intended that the wife or child should take a beneficial interest in the property, because under such circumstances there is a presumption that the property was transferred to the wife or child as a gift or advancement. This presumption is not conclusive but may be rebutted by proof, and whether or not a resulting trust arises in such a case is purely a question of intention. The burden of proof is upon the party seeking to establish a resulting trust, and the evidence, to be effective for that purpose, must be clear, unequivocal and unmistakable, and if it is doubtful or is capable of reasonable explanation upon any theory other than the existence of a trust it is not sufficient. *Link* v. *Emrich,* 346 Ill. 238; *Wies* v. *O'Horow,* 337 id. 267; *Tritchler* v. *Anderson,* 334 id. 211; *Delfosse* v. *Delfosse,* 287 id. 251.) The presumption of gift is not to be frittered away by mere refinement. (*Dodge* v. *Thomas,* 266 Ill. 76; 3 Story's Eq. Jur. (14th ed.) pars. 1601, 1602.) In the present case, out of money previously handed her by the husband the wife herself paid over the entire amount of the $4000 cash payment due on the purchase price and joined in executing notes and a mortgage to secure the $3500 balance due. These circumstances operate to make application of the general rule all the more indisputable. The presumption that appellant was vested with an estate in joint tenancy in her own right is not rebutted in this case by evidence which clearly, unequivocally and unmistakably shows that the entire interest is in appellee, and appellant is therefore entitled to partition. (Cahill's Stat. chap. 106, par. 1; *Anderson* v. *Anderson,* 339 Ill. 400.) Appellant

concedes that the $2000 paid her from appellee's bank account pays for his joint interest.

Appellee asserts that at the time he executed the contract he was told by Mishkin that joint ownership meant that when a house is purchased in the name of a man and wife, if one or the other dies then the house goes to the surviving party without going through a lawsuit; that this was the only explanation he had of it, and that he supposed the property would be in his own name and that he would have the control of it during his lifetime. He contends that the situation here is fundamentally the same as the one in *Partridge* v. *Berliner,* 325 Ill. 253, where this court held that although conveyance had been made to a wife in joint tenancy her conservator was not entitled to partition. In that case the record disclosed facts which unmistakably rebutted the presumption of a gift, and the decision was based upon that ground. There the husband told the lawyer who drew the deed that he wanted to have entire control of the property as long as he lived, his wife who was present said she did not want any of her folks to get any of the property, and other testimony made it plain that the wife approved of what was said and done and claimed no interest of any sort except a right of survivorship. The state of the evidence in the case at bar precludes any such conclusion as was reached in the *Partridge case.*

Appellee contends that the funds received by appellant from him remained his property and that the present record affords no basis for concluding that there was any money gift whatever to appellant. Assuming this contention to be well taken, our conclusion as to the Whipple street property would not be affected. If appellee had made the payment for that property out of his own pocket directly, the presumption of gift of an interest in joint tenancy would still remain unrebutted. However, from the standpoint of the money handed over by appellee out of

the pay envelopes and not put into the Whipple street property, the bond for appellee or his bank accounts, the rights of the parties are dependent upon whether there is merit in the contention, and it demands consideration accordingly. In its support counsel cites *Rothwell* v. *Taylor,* 303 Ill. 226, *Bolton* v. *Bolton,* 306 id. 473, *Telford* v. *Patton,* 144 id. 611, and other cases, which lay down the rule that where the issue is whether a gift has been made, the burden of proof is upon the donee to prove the essential facts of a gift, such essentials being the delivery of the property by the donor to the donee with intent to pass the title. As will appear from examination of the cases cited, their concern was with the question of delivery of and transfer of dominion over the chattel involved. There can be no question here of transfer of dominion. Appellee testified that he handed over all of his money. The state of the record warrants no such finding, but substantial amounts were, admittedly, handed over to appellant. That she was told to use them, in part at least, is indisputable, and even under appellee's version of affairs her power to spend them was not restricted within any definite confines. To be sure, the fact that there was a transfer of dominion would not necessarily preclude appellee from claiming a resulting interest of equitable nature in some ascertainable portion of the sums which he handed over. If the same rule be held to apply to such a situation as the general one which governs transfers of realty the question is purely one of intention, the presumption being that a gift was intended and the burden of proof being upon the one who seeks to establish a resulting trust. That the same rule does apply has already been indicated by this court in *Bromwell* v. *Estate of Bromwell,* 139 Ill. 424, where we said: "Thus, where a husband hands money to his wife, or a father to a child still dependent upon him, the presumption naturally arising is that the act is in performance of the legal obligation resting upon husband or father to maintain or sup-

port the wife or child or in obedience to the affection naturally growing out of the relation, and in such cases the transaction is *prima facie* a gift and not a payment or loan." In *Lowenberg* v. *Booth,* 330 Ill. 548, we held that where a wife takes title in her own name and executes a note and mortgage for part of the purchase price, payments made by the husband on the note are presumed to have been made as a gift, and to overcome this presumption the burden is on the parties claiming that the husband had a beneficial interest, to prove that a gift was not intended and that there was an obligation on the wife's part to hold the property in trust for the husband. See, also, *Powell* v. *Powell,* 260 Mass. 505, 157 N. E. 639; *Gorrell* v. *Gorrell,* 97 N. J. Eq. 367, 127 Atl. 346; *In re Johnson's Estate,* 116 Neb. 686, 218 N. W. 739.

Has appellee sustained the burden of rebutting the presumption of gift by evidence which clearly establishes a contrary understanding? We cannot so hold. His testimony that he told appellant to pay her expenses and save the "rest" for him and that she assured him from time to time that she was saving it for him is not corroborated by other witnesses and is directly contradicted by her. Significant among the surrounding circumstances are the separate bank accounts maintained by both parties. To appellee's knowledge appellant continued the account which she had when she was married and also opened up a new one in her own name. Appellee continued the account which he had before marriage, and this account was active thereafter. His testimony that after the marriage he never visited the bank where this account was kept until 1928 and never made any deposits in it is contradicted by the corroborated testimony of appellant, but his case is not strengthened even if his contention that appellant made all the deposits to his account be accepted. The maintenance of an account in his name in which appellant deposited portions of the sums given by him to her not only does not

support the theory that money deposited in her own accounts belonged to him but tends rather plainly to contradict it. After the marriage a second bank account was started and maintained by appellee in his own name. With this latter account appellant had nothing to do. She rented and maintained a safe deposit box in her own name. A $500 bond was bought and registered in the name of appellee. All of these circumstances point to the conclusion that the financial arrangement between the parties contemplated separate and distinct property interests in each, and that, rather than appellant being a bare trustee for appellee, she received in her own right the amounts which went into her own accounts.

Appellee refers to what he terms "this very usual arrangement among laboring people wherein the husband brings the pay envelope home to the wife and from this she pays the expenses," and contends that under such circumstances the husband creates the wife his agent to disburse his wages, any balance remaining necessarily belonging to him and not to her. There would be more force in this argument as applied to the present case if it clearly appeared that all the money earned by appellee was turned over to appellant and remained under her dominion. In any event, the danger of making the station in life of the parties a test was well brought out in *Beck v. Beck*, 78 N. J. Eq. 544, 80 Atl. 550, where the court, referring to the chancellor, said that "he took judicial notice, apparently, that it is the usual, customary habit of such people to constitute the wife the treasurer and to turn all moneys from every source over to her. He limited this custom, apparently, to what he called 'low wage earners' but did not define this term. What might appear high wages to one would appear low wages to a man more fortunately circumstanced. The test is too uncertain, and introduces one rule for one class of people and a different rule for a class with larger income without drawing the dividing line." As

we have already pointed out, the question as to whether property transferred by husband to wife constitutes a gift or does not constitute a gift is one of intention. In *Bromwell* v. *Estate of Bromwell, supra,* we said that where a husband hands money to his wife the presumption is that the transaction is a gift. This constitutes a clear and workable rule, applicable to all cases. Assuming that there may be cases in which the transaction between husband and wife is one of agency, no such relationship can be held to be established by the evidence here disclosed.

The decree of the circuit court is reversed and the cause remanded, with directions to enter a decree in accordance with the views herein expressed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Edmunds is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Reversed and remanded, with directions.*