(No. 22971
MAURICE A. SPALDING, Appellant, *vs.* DORA SPALDING, Appellee.

*Opinion filed October 14, 1935.*

Farthing, J., dissenting.

Harold A. Fein, for appellant.

Oscar S. Seaver, and Henry F. Antes, for appellee.

Mr. Justice Herrick delivered the opinion of the court:

Maurice A. Spalding, complainant in the trial court and appellant here, in the superior court of Cook county filed his bill for divorce against Dora Spalding charging her with extreme and repeated cruelty, and also prayed for the return of a Lincoln automobile alleged to have been taken by her. Her answer denied the allegations of cruelty and the ownership of the automobile by the complainant. She filed a cross-bill for separate maintenance, charging the complainant with cruelty and praying that a deed be set aside which she had signed conveying to her husband her interest in certain real estate, that the several interests of the parties in such real estate be determined, an accounting had, and alimony, together with solicitors' fees, be awarded her. The husband answered the cross-bill, denied the charges of cruelty and that his wife was entitled to any part of the relief prayed.

On the question of divorce and separate maintenance the chancellor heard the issues in open court, announced on January 27, 1933, that while the husband would not be

granted a divorce the wife would be, upon properly amending the prayer of her cross-bill, and that the entry of decree would be deferred until the master made his report. On that same day the remaining issues were ordered referred to the master in chancery. After all the evidence had been taken before the master, the husband on November 7, 1934, submitted to the chancellor a motion to vacate the order of reference on the ground that it was contrary to the statute. No action was then taken on the motion. On December 26, 1934, the master filed his report, and on that day an order was entered *nunc pro tunc* as of January 27, 1933, granting the wife leave to amend her cross-bill by striking out the prayer for separate maintenance and substituting therefor a prayer for divorce. Such amendment was filed the same day. Two days later the husband filed his answer to the cross-bill as amended. The objections of the husband to the master's report and findings were ordered to stand as exceptions, and on January 29, 1935, the court overruled such objections, entered a decree in favor of the wife for divorce, canceled the deed made by her to him, ordered the husband to convey to her a $\frac{24946.67}{43957.34}$ part of said real estate, awarded her certain chattel property, decreed that the complainant pay his wife $44,663.95, that execution issue therefor and that complainant pay costs of suit, and dismissed the complainant's bill for want of equity. No award of alimony or solicitors' fees was made. Jurisdiction of those questions was reserved for later determination. The husband has appealed directly to this court, a freehold being involved.

Many alleged errors are argued. The husband claims that inasmuch as the wife's cross-bill only asked for separate maintenance and not divorce the court was without power to order the cause referred. It is well to remember that only the issues made in the cross-bill other than for separate maintenance were referred to the master. Those matters were all germane to the original bill filed, in the

sense that the matters involved therein, with one exception, grew out of the transactions between the husband and wife during the existence of the marriage relation, and the sufficiency of the cross-bill was not tested by demurrer. This court in *Decker* v. *Decker*, 279 Ill. 300, recognized the right of a wife to demand an accounting of her husband and have her rights in certain property determined in a bill brought by her for separate maintenance. It was established in *Kartun* v. *Kartun*, 347 Ill. 510, that relief would be granted to a wife on a bill brought by her for an accounting and for the partition of certain real estate held under a deed conveying the premises to herself and her husband in joint tenancy, where they had ceased to cohabit although continuing to occupy the same property. At the time the decree here was entered the cross-bill had been theretofore amended and a divorce thereby sought. It was wholly immaterial as to whether the amendment was properly filed *nunc pro tunc* as of January 27, 1933, or of December 26, 1934. A sufficient cross-bill as amended was on file at the time the decree was entered. The trial court had jurisdiction of the parties and the subject matter of the litigation. The effect of the decree was to overrule the motion of November 7, 1934, to vacate the order of reference, and such ruling was correct.

The record is very voluminous and a detailed statement of all the evidence would be impracticable. Attention will be given to such portions, only, as we deem to have a material bearing on the issues here reviewed. On some of the important controversial issues the testimony of the parties is in irreconcilable conflict. The evidence justified the chancellor entering the decree of divorce for the husband's fault. The parties were married March 20, 1920, the day following the husband's graduation from medical school. No children were born of the marriage. Immediately after his marriage the husband began serving as an interne in one of the local hospitals. At the time of

the marriage the wife had an estate worth about $80,000, consisting of real estate, money, bonds and mortgage securities. The husband had no property and was in debt. Shortly before they married Mrs. Spalding permitted her husband to have $3000 of her bonds, which he used as collateral security for a loan. The money borrowed thereon he used to discharge an indebtedness of $3000 owed by him. In December following the marriage the wife sold her interest in a tract of real estate and received net therefor $47,495.79, which she deposited in her savings account in the Security Bank of Chicago. During the month the husband suggested to his wife that he thought it unsafe for her to have that amount of money standing in her name; that someone might induce her to make some foolish investment, and now that they were married she should open a bank account in his name; that by this method he would have to sign the checks and thus could keep in touch with whatever she bought. In conformity with this idea of her husband's, on December 20, 1920, the wife withdrew $32,200 from her savings account and deposited the same in a new account opened that day in her husband's name in the same bank. The next day the husband wrote a check against this account for $3000, which he used to pay off the $3000 loan secured by his wife's collateral. Two thousand dollars of these securities he returned to her. On January 22, 1921, he drew two checks against the account, one for $2000 which he used to pay other personal debts owed by him, the other for $332 to pay the premium on a life insurance policy issued on his own life with his wife named as beneficiary. Incidentally it may here be remarked the record discloses the husband has since borrowed the full loan value on the policy and changed the beneficiary. On February 14, 1921, the husband drew $800 from the bank account in his name and opened a personal checking account in the Scheubert & Ambry Bank. The wife got the benefit of the remainder

of the $32,200 deposit by investments purchased in her own name from this account.

The master in stating the account between the parties charged the husband with the $4000 loan. This sum was reached by debiting the husband with the $3000 securities loaned to him before the marriage, plus the $3000 which he withdrew from the bank account, and crediting him with the $2000 securities returned to his wife. He also charged the husband with the withdrawals by him from this account of the items of $2000, $332 and $800. It is apparent that the original $3000 of securities was obtained by the husband from his then fiancé with the expectation on his part of re-paying her, as is evidenced by the fact that when the securities were redeemed by the discharge of the loan the husband promptly returned to her $2000 of such securities. The circumstances attendant upon opening the bank account clearly show that it was not contemplated that the $32,200 deposited therein, nor any part thereof, was intended as a gift on the part of the wife to the husband. The evidence amply supports a promise on the part of the husband to re-pay the sums withdrawn for his use, aggregating $7132, and the chancellor was warranted in overruling the husband's exceptions to these several items and entering a decree requiring the husband to re-pay those sums.

The husband completed his internship about May of 1921. During that month, having access to his wife's safety deposit box, he withdrew some of the securities which stood in her name, cashed a check against his account in the Scheubert & Ambry Bank and deserted his wife. She had a warrant sworn out for him. He was arrested in Vincennes, Indiana, and brought to Chicago. The securities he had taken were surrendered to his wife. After this affair she procured a new safety deposit box to which the doctor did not have access. On the husband's return from Indiana the parties apparently composed their

differences and during the succeeding eleven years lived together. Shortly following his return from Indiana the doctor took a special course of some three or four months at the University of Chicago. He opened his first office in April, 1922. His practice during the first few years was of an intermittent nature, without very satisfactory financial returns. From the time of the marriage until the spring of 1927 the parties occupied apartments. The wife testified she paid the apartment and garage rents and the living expenses from 1920 to March, 1927. There was a dispute on this question, and in his report the master stated that he had reconciled the evidence on that subject as best he could and found that the wife was entitled on such accounting to a net credit of $3960 for rent paid by her for the several apartments occupied by the parties, and the further sum of $4800 paid by her for their joint living expenses from March, 1920, to March, 1925.

In the wife's cross-bill as amended she made no charge that the husband had ever requested her to pay the rent or living expenses, or that she had at any time asked him to re-pay her, or that he had promised to reimburse her for any payments so made. There is no evidence of any fraud committed nor of coercion on the part of the husband by reason of which the wife made such payments. In so far as the evidence discloses she made the same voluntarily. In her testimony she does not claim otherwise. In this State a wife may deal with her separate property as she sees fit. She may give it to her husband if she desires, and a gift from wife to husband may be valid, depending on the circumstances attending the transaction, except as against creditors, and while such transactions are carefully scrutinized by the court, yet where the gifts are fair and reasonable and not procured by the fraud or imposition of the husband they will be enforced. 1 Schouler on Marriage, Divorce, Separation and Domestic Relations, (6th ed.) sec. 553, p. 566.

The appellee urges that during the marriage relation the husband owes to the wife the duty of support and maintenance, and therefore the husband here is legally liable to reimburse his wife for the expenditures made by her for that purpose. Such is the general rule where the parties are living separate and apart by reason of the husband's fault. That rule does not apply in the case at bar. Her reimbursement is claimed for expenditures made during the time the parties were living together in the marriage relation. While in that situation it is the duty of the husband to support and maintain his wife, yet such duty is not a debt within the legal acceptance of that term. If a husband uses his wife's property for the support of the family with her knowledge and consent, a gift of such property by the wife may be inferred in the absence of proof of a contrary agreement, (*Duval* v. *Duval,* 153 Ill. 49; *Reed* v. *Reed,* 135 id. 482;) and where a wife permits her husband to receive the income from her separate estate and use it for the family support the circumstances may justify the inference of a gift. (*Wolkau* v. *Wolkau,* 299 Ill. 176.) Payments made by the wife out of her own funds towards the liquidation of family expenses are not regarded as advancements to the husband nor as a debt owing from him to her. (*Agnew* v. *Agnew,* 185 Pac. (Col.) 259.) The law will not imply a contract on the part of a husband to re-pay his wife for her property brought into, used and consumed in the household, (*Cranson* v. *Cranson,* 4 Mich. 230,) nor will a contract be implied on the part of a husband to pay his wife rent where they made the family home on property owned by her. (*Trefethen* v. *Lyman,* 90 Me. 376, 38 Atl. 335.) In the absence of proof of a contract to re-pay money of the wife used to pay for hardwood floors in the dwelling house, title to which was in the husband, no recovery can be had by the wife. (*Spruance* v. *Equitable Trust Co.* 103 Atl. (Del.) 577.) A widow cannot recover from her deceased

husband's estate for money paid by her for family necessaries as a contribution towards family expenses when at the time the payment was made the wife did not expect reimbursement. (*Kosanke* v. *Kosanke,* 137 Minn. 115, 162 N. W. 1060.) We are of the opinion that the weight of authority supports the principle that for payments voluntarily made by the wife for family expenses during the time the husband and wife are living together, in the absence of proof of a specific agreement for re-payment by the husband, the law does not create an indebtedness of the husband to the wife. (*Williams* v. *Williams,* 236 S. W. (Tenn.) 426; *Third Nat. Bank* v. *Guenther,* 123 N. Y. 568, 25 N. E. 986.) Public policy, ever interested in the maintenance of a harmonious marriage relation, prohibits a contrary rule. It would be disastrous to marital felicity where the parties have maintained a plane of living for both and in which the husband has acquiesced, where such expense has been voluntarily assumed and freely borne by the wife, to require the husband, after the lapse of years, to account to the wife for such expenditures so made by her. The superior court was in error in requiring the husband to pay his wife the sum of $8760 for rents and living expenses paid by her.

The master charged the husband with the sum of $2700 representing the purchase price of a Paige automobile, and with $4000 the cost of a Lincoln roadster. The exceptions of the husband to this finding of the master were overruled and the finding sustained by the trial court. The evidence of the wife is, that in the fall of 1921 she purchased the Paige for $2700 with her own funds; that this automobile was bought for her husband's use in the practice of his profession; that in 1922 she bought a Lincoln roadster, the Paige being traded in on the purchase price and the difference paid by her; that the Lincoln roadster was also bought for the doctor's use professionally.

It is not clear from the evidence whether she paid $4000 in addition to the credit allowed on the Paige or whether the price of the Lincoln was $4000. The trade-in value of the Paige is not shown. In 1925 a Packard automobile was purchased out of the common funds of the parties. In 1926 this Packard was traded for another Packard and the difference paid in cash from the commingled funds of the parties. In 1929 this Packard was traded in on an eight-cylinder Packard. Whose funds paid for this car does not clearly appear from the evidence. The other Packard was given by the doctor to his cousin on the farm. In 1931 a Lincoln sedan was purchased by the doctor through his wife's brother. At the time, the doctor stated he was buying this car for his wife. The Lincoln sedan was used by her, while the doctor used the Packard. Mrs. Spalding testified that the doctor never drove the Lincoln sedan except when the Packard was being serviced. This arrangement was apparently changed, as, according to her evidence, at the time she testified the doctor then had the Lincoln sedan and she the Packard. In her cross-bill, filed on May 17, 1932, and verified by her oath, she stated she bought and gave the Paige automobile to her husband, and later on the cross-bill alleged that she purchased the Lincoln roadster, paying the difference in cash between it and the Paige car which was turned in as part payment, and delivered to him the Lincoln, to be used by him in the practice of his profession. At the time the Paige and the Lincoln roadster, respectively, were purchased by the wife there is no doubt she then never intended to collect the price of either from her husband. There is no evidence of any request by the doctor that she buy either of the cars. The record is barren of evidence of any fraud, duress or imposition practiced upon her by which she was induced to purchase either vehicle. The fact that the marriage has proved a failure, that each party desires to be released of its obligations, and that it is now

apparent the wife in buying these automobiles for her husband exercised poor judgment, does not justify a court of equity recanting for a wife gifts made by her to her husband. The chancellor was in error in charging the husband with the purchase price of the two automobiles. In the original bill filed by the doctor he claimed title to the Lincoln sedan. This ownership was denied by the wife. The decree of the court does not determine the ownership of that car.

There is a grave dispute between the parties respecting the doctor's earnings from his profession. To attempt to reconcile their evidence on that subject would be a hopeless task, for it cannot be done. Such earnings are only incidental to the issues here. The doctor testified his income in 1921 was about $3000; in 1922, $10,000; in 1923, $25,000; in 1924, $40,000, and from 1925-1931 from $40,000 to $60,000, and that there was a marked decline after the latter years. There is other evidence showing that he had a large and flourishing practice. He testified that substantially all his earnings were turned over to his wife and that she had thriftily secreted enough funds therefrom to keep her the rest of her life. On the other hand, the wife claims that during the period of his greatest prosperity his earnings were about $9000 a year and that she has accounted for all that came to her charge. We believe the doctor's opinion of his earnings is somewhat inflated. The evidence does tend to prove the wife came to the office at stated intervals and received money and checks which had come to the office in due course of the doctor's practice. Considerable cash was kept in a safety deposit box, wherein there was placed also the wife's income from securities held by her and the rent received from the second apartment of the Manor avenue house owned by them. The husband had access to the box. There is no dispute but that in the later years of the marriage the

funds were commingled and kept either in a safety deposit box, at the home of the parties, or in a joint bank account.

On April 11, 1927, the property referred to as the Manor avenue property was bought for the sum of $45,000 and title thereto taken in the husband and wife as joint tenants. The parties separated on March 18, 1932. On February 1, 1932, the wife purported to convey her interest in such property to her husband. She claims she made this deed in reliance upon her husband's promise that if she would transfer to him her interest in this property he would pay off certain notes at the Pioneer Bank bearing her signature and reimburse her for money which she had previously applied on the original indebtedness to that bank. The husband claims that in consideration of his wife's agreement to deliver certain stocks in her possession standing in his name and the transfer to him of her interest in the Manor avenue property he paid her $20,000 one day during the last ten days of January, 1932. He testified that his brother, Harry, brought from Indianapolis, Indiana, the $20,000 in fifty-dollar and one-hundred-dollar bills, wrapped in a newspaper; that at the time of the payment to his wife, Harry Spalding, a cousin, and C. J. Harrison and himself, were present; that the transaction occurred at the Manor avenue home about 6:00 o'clock in the evening; that Harry Spalding handed the package to Mrs. Spalding; that she opened it, counted the money and stated she was satisfied; that the husband then asked her, in the presence of the witnesses, if she agreed that for the $20,000 she would deed him the Manor avenue property and turn over the stocks to him; that she said yes, took the money and went to another part of the residence.

C. J. Harrison and Harry Spalding testified to substantially the same facts as to the occurrence at the residence. Harry Spalding stated that in 1924 he drew the

$20,000 from his account in the West Street Branch of the Fletcher Bank, in Indianapolis; that he carried it from Indianapolis to Vincennes and kept it there concealed on his premises; that he carried the money back to Indianapolis, to which place he later moved, and there kept the money hidden about his premises until he brought it to Chicago at the request of his brother. The deposition of the assistant cashier of the bank in Indianapolis was offered in evidence together with copies of Harry Spalding's account there during 1924. No balance or withdrawal at any time during that period aggregating $20,000, or any substantial portion thereof, was shown by such exhibits. On March 22, 1932, about seven weeks after his alleged payment of the $20,000 in currency to his wife, the husband sent to her by special delivery a letter in which he enclosed a ten-dollar money order, and in which letter he wrote, amongst other things: "Sorry I didn't ask you if you needed money the other nite, cause you probably do. * * * Will try and send you more before the week is over. Send this special you may need it to-day," etc. Stating the fact mildly, we are of the opinion that the husband signally failed to prove the payment of the $20,000 to his wife, and the trial court properly set aside and vacated the deed made by the wife to the husband under date of February 1, 1932.

A further issue is presented with reference to the Manor avenue property. The evidence shows the wife had charge of the purchasing of the property, that the husband was not present at the time the deed was drawn or delivered, that the wife was, and she had the deed made to herself and husband as joint tenants. The evidence discloses that part of the purchase price was paid out of currency from the safety deposit box in which the funds of the wife and husband were commingled, a part was paid by the doctor's own funds and a part by the wife's funds.

The master further found that the wife had contributed the sum of $\frac{24946.67}{43957.34}$ part towards the purchase price of the property, and the decree fixed her proportionate share as that aliquot part in the property and ordered the husband to convey it to her. We are not convinced that this accounting is correct, but in the view we take of the case it is wholly immaterial. Under the facts shown by the record the doctrine of resulting trust is not properly applied to the instant situation. Regardless of the amount contributed by the wife or by her husband from the separate funds of each and irrespective of the contribution from the commingled funds, the wife conducted this business transaction and caused the title to be made to herself and husband as joint tenants. If she contributed more than one-half of the purchase price such excess must, under the evidence in this case, be deemed to have been a gift on her part. (*Anderson* v. *Anderson,* 339 Ill. 400; *Doyle* v. *Doyle,* 268 id. 96; *Jackson* v. *Kraft,* 186 id. 623; *Reed* v. *Reed, supra.*) The rents from the rented portion of the property were divided equally, although the doctor appears to have paid the expenses of up-keep, taxes and insurance without charging any portion thereof to his wife. The chancellor was in error in not finding that the husband and wife were joint tenants in the property, with equal interests therein.

We have carefully examined the record as to the disposition of the household furniture and chattel property. The court was justified in finding the ownership of such chattels in accordance with the decree, and the chancellor's findings will not be disturbed on that issue.

There remains for disposition the finding of the court with reference to the indebtedness to the Pioneer Bank. In March, 1929, appellant commenced a course of speculation in the stock market. The wife, under his direction, handled these purchases and sales. The speculation apparently continued through several months and resulted

in a substantial loss. The first purchase was made from money accumulated in the common safety deposit box. In October, 1929, certain stocks were purchased by Mrs. Spalding, at the direction of her husband, through the Pioneer Trust and Savings Bank, called herein the Pioneer Bank. This stock was paid for with funds taken from the same safety deposit box. On October 23, 1929, appellant further instructed his wife to make purchases and to finance them through loans to be obtained from the Pioneer Bank. Different purchases and sales were made. The first notes for money borrowed with which to finance such speculations were signed by the complainant. On October 29 certain stocks bought, but not paid for, came into the bank. Mrs. Spalding, in order to raise the money to settle for the stock, obtained a note from the bank for the purpose of having her husband sign it, but being unable to locate him was then told by a bank official that she could sign the note, which she did. On that same day she obtained her husband's signature to the note originally given to her by the bank for his signature, but this note was not used. The subsequent notes for the loans and renewals were signed by her. With the husband's knowledge different securities of the wife were pledged as collateral for these loans. Thereafter, as some of the securities matured, the proceeds thereof were paid into the bank, were credited by it on the indebtedness, and from time to time other securities were sold by the wife and likewise applied, and on demand of the bank she eventually raised money by sale of other of her securities, with which she paid the balance of the indebtedness to the bank. Some of the stocks purchased were issued in the name of the husband and some in the name of the wife, but the preponderance of the evidence shows that the entire course of speculation was carried on at the suggestion and direction of the husband. It was his business. She was merely his agent. The decree of the court finds that the wife paid

out of her funds for the purchase of sundry stocks during the course of such speculative transactions the sum of $22,071.95 and ordered payment of such sum by the husband to the wife. The evidence warranted such finding and decree.

Other errors which have been assigned and argued have been reviewed, but the court's findings upon those controversial issues will not be disturbed.

The decree of the superior court is affirmed in part and reversed in part and the cause is remanded to that court, with directions to enter a decree in conformity with the views herein expressed.

> *Affirmed in part, reversed in part*
> *and remanded, with directions.*

Mr. JUSTICE FARTHING, dissenting:

The majority of the court have overlooked and ignored the rule recognized in *Gilbert* v. *Gilbert,* 305 Ill. 216, and *Termaat* v. *Termaat,* 357 id. 472, with reference to the division of property between husband and wife in a divorce proceeding. The rule which permits an inquiry into the amounts contributed by joint tenants was also recognized in *People* v. *Varel,* 351 Ill. 96. Section 17 of the Divorce act (Smith's Stat. 1935, chap. 40, par. 18,) is also totally disregarded and treated as non-existent. There is no reason given for binding the hands of the chancellor by the presumption of a gift in the case before us where the tenancy was joint that would not apply with equal force to a husband or wife who held the fee simple title absolute. The results of the rule laid down would be most disastrous if a "gold-digger" married, obtained title to her husband's real estate and divorced him. If the presumption of gift applies in the instant case it would apply with equal force to the hypothetical case of the gold-digger.