(No. 24488.

DANIEL B. SCULLY, JR., *et al.* Appellants, *vs.* AUGUST WILHELM *et al.*—(AUGUST WILHELM, Appellee.)

*Opinion filed April 15, 1938—Rehearing denied June 8, 1938.*

HEALY & LEE, JOHN E. NORTHUP, and SANFORD OLSON, (JOHN H. S. LEE, and CAMERON F. WOODS, of counsel,) for appellants.

LESLIE H. WHIPP, and DWIGHT McKAY, for appellee.

Mr. JUSTICE JONES delivered the opinion of the court:

Appellants, nephews and nieces of Mary Scully Fagan, brought this suit, as heirs of said Mary Scully Fagan, to have her marriage to appellee, August Wilhelm, annulled, and to have four deeds from her, through the device of a "dummy," to herself and Wilhelm as joint tenants, set aside. The amended complaint alleged that Wilhelm entered into a fraudulent plan or conspiracy to get into communication with aged and mentally weak women having considerable property, to pretend to court such women, and by false pretenses and various fraudulent means and undue influence, either by pretended marriage or otherwise, obtain possession of their property and means. It alleged that at the time of the pretended marriage, May 6, 1933, Mary Scully Fagan was seventy-five years of age, was senile and in her dotage, and had not sufficient mental capacity to enter into a valid marriage, and that such lack of mental capacity continued and increased from the date of the marriage to the date of

her death. It alleged that Wilhelm was thirty-five years old and had no business ability and no financial means. It further alleged that, in pursuance of his plan, Wilhelm pretended to court Mary Dean, a widow of fifty-six years of age and of weak mind, who had considerable property, and that by fraud, false pretenses, and undue influence so influenced her mind and will that he obtained from her the management and control of her property and business affairs, and that he induced said Mary Dean to be estranged from her relatives by falsely representing to her that they were attempting by fraud to deprive her of her property.

The amended complaint further alleged that, thereafter, Wilhelm learned that Mary Scully Fagan was a widow several times wealthier than Mary Dean; that by similar means he caused Mary Scully Fagan to become estranged from her relatives; that Wilhelm persuaded Mary Scully Fagan to enter into a marriage ceremony with him though she was insane and incapable of understanding the nature and obligation of a marriage contract; that after the marriage, in order to defraud plaintiffs of all their interest in certain real estate, Wilhelm, by false pretenses, fraud, and without consideration, procured Mary Scully Fagan, in July, 1933, to execute deeds to four parcels of real estate, by the use of a "dummy," to herself and Wilhelm as joint tenants; that after the marriage Wilhelm intentionally advised a course of life on her part beyond her endurance, taking her to night-clubs and dances, with the purpose of endangering and shortening her life; that in July, 1933, Mary Dean preferred a charge of embezzlement against Wilhelm, and that Mary Scully Fagan learned of this; that Wilhelm feared she would have the marriage annulled and expose his conduct and fraud; that Mary Scully Fagan thereupon died, suddenly, mysteriously, and very opportunely for Wilhelm, in September, 1933, and that Wilhelm gave inconsistent accounts of her death. Defendant Wilhelm's answer denied all the principal allegations of the bill.

The cause was heard by a jury, and, at the outset, two issues were framed for their determination. First, was Mary Scully Fagan sane at the time of the marriage? Second, did Wilhelm fraudulently and by undue influence procure Mary Scully Fagan to execute the deeds? At the close of the evidence the chancellor instructed the jury to find for Wilhelm on the second question. The jury found Mary Scully Fagan was sane at the time of the marriage. After the verdict was returned, appellants moved the court for leave to amend the amended complaint, and for leave to introduce additional evidence, supported by an affidavit as to what the testimony would be. Both motions were denied, and the complaint was dismissed for want of equity.

The vast amount of evidence, which it will be impracticable to detail here, was highly conflicting on every essential point, including the age of Mary Fagan. It is agreed that she had been a widow since 1913, was childless, and that at the time of the marriage in question she was worth approximately $300,000. Several witnesses, including relatives and friends of Mary Fagan, some of whom claimed to have known her practically all her life, testified that she was seventy-five years old at the time of the marriage, and others testified that she appeared to be approximately seventy-five years old. Evidence on behalf of appellee as to the age of Mary Fagan consisted of testimony of several witnesses that she appeared to be from fifty to sixty years old; a sworn statement by her in her application for a passport in 1929, according to which she would have been sixty-two years old at the date of her marriage, and her application for dispensation to marry Wilhelm and her application for marriage license in which she stated she was fifty-three. According to witnesses for the appellants, prior to the time she met Wilhelm in 1931, Mrs. Fagan had always lived a quiet and placid life and had indulged in no vices or habits injurious to her health; did not smoke or drink, dressed in clothes of quiet color befitting her age; was a member and

regular attendant at church, and spent her money sparingly and economically. She had always been somewhat slow of understanding; had no interest in reading and had little or no interest in business; she had been on close and intimate terms with appellants, her nephews and nieces and also with their parents, and had visited their homes often. After she met Wilhelm she began smoking and drinking to excess; she began to wear a lot of rouge and paint herself like a young girl; she appeared in public intoxicated, flighty and foolish; she giggled without cause and burst into tears without apparent reason; she ceased attending church; began dressing in sporty and bizzare clothes, and either dyed her hair or wore a transformation. Wilhelm addressed her as his "dear" and as his "sweetheart" and he embraced her and said he was her "Romeo" and looked at her and said it was a grand night for lovers. He pretended to her that in her he "had finally found his one true love." He gave her flowers saying, "At last I have found my heart's desire." She told her relatives he was rushing her off her feet; that she was the belle of the night-resorts to which he took her, and that Wilhelm was very jealous of her. She was forgetful, her speech was incoherent and she could not give a connected account of a movie scene. She boasted of her dancing ability, talked about young men, and wanted to go roller-skating. She complained of people ringing her door bell and hiding behind trees on her lawn. On one occasion when she was walking home she found herself standing on a corner singing with the Salvation Army. Mrs. Catherine Berry, an employee of the bank with which Mary Fagan transacted business, stated she thought Mrs. Fagan was "starting to totter." Three expert witnesses for appellants, in answer to hypothetical questions, stated that, in their opinion, Mrs. Fagan was insane.

The evidence in behalf of the appellee Wilhelm was to the effect that Mrs. Fagan continued to live a normal life after her acquaintanceship with Wilhelm; that she had been

smoking cigarettes and drinking liquor moderately for many years before she met him; that after meeting him, she never drank to excess; she continued to attend church; she continued to dress neatly but conservatively; she had a sense of humor and laughed heartily on appropriate occasions and likewise cried on appropriate occasions; she played the piano well and sang well; she was interested in current events and enjoyed the theater and opera; she had always liked to dance; she had many friends whom she entertained and by whom she was entertained at teas and luncheons; she was intelligent and talked coherently; she was annoyed by newspaper men and photographers ringing her door bell and hiding behind trees at the time Wilhelm was arrested on the charge of embezzlement; she told friends she was tired of living in hotels and wanted a home; she met August Wilhelm, in 1931, through a mutual friend, and their friendship existed for two years before it culminated in marriage, in 1933; they were actually very happy together; that Mrs. Wilhelm was friendly with her relatives both before and after her marriage, but frequently became provoked with them. Several witnesses who had transacted business with her for many years testified, in substance, that she was capable of transacting ordinary business; that she had an agency account with a bank; that she took the bank's advice as to what mortgages, etc., were good, but that she so arranged her investments as to maturity and rate of interest that she had a steady flow of income; that she invested in government bonds because they were safe and readily convertible into cash; that she kept a book of account in her own handwriting covering her investments, showing the name of the security, amount and date of its maturity, amount of interest and the respective dates when the interest came due; that she owned various parcels of real estate and that she personally negotiated leases with the tenants; that, in 1932, she took over and operated a drug store and later sold it. She kept a checking account and

personally wrote out checks for the payment of taxes, rent, living expenses and wages of laborers. Some of these witnesses testified she was a very competent business woman. Two expert witnesses, in answer to hypothetical questions, stated that, in their opinion, Mrs. Fagan was sane.

The only testimony as to the execution of the deeds was that of Mrs. Fagan's attorney, Ellis D. Whipp, and High Boyajian, the "dummy" in the transaction. Whipp stated that Mrs. Wilhelm came to his office on July 16 or 17 and said she would like to make four joint tenancy deeds conveying to herself and husband four pieces of land in joint tenancy; that he asked her if she knew what joint tenancy meant and she said she thought so. "It means that we both take title together and if Wilhelm should die before I do, it comes back to me and if I should die before he does, it goes to him;" she told him her husband would be in the office in a few days to make the deeds and for Whipp not to tell him because she wanted it to be a surprise; that a few days later she and Wilhelm came to his office and Mrs. Wilhelm said, "Augie, I have a little surprise for you. I am deeding four pieces of property to you and me as joint tenants." Wilhelm said, "That is very kind of you." Boyajian stated that he was a lawyer in the office of Whipp, and that, on July 17, Whipp told him that Mrs. Wilhelm wanted to transfer some property to herself and husband in joint tenancy and wanted him to act as grantee, and that, on July 20, the deeds were delivered to him as grantee in the presence of Ellis Whipp, Wilhelm and Mrs. Wilhelm, and that he delivered four deeds signed by him as grantor to the Wilhelms.

Appellee filed a motion to dismiss all the plaintiffs except Daniel B. Scully, Jr., on the ground that they did not join in the notice of appeal by signing it as required by rule 33 of this court, which provides that the notice of appeal "shall be signed by or on behalf of the party or parties joining in the notice of appeal." (Ill. Rev. Stat, 1937, chap. 110, par. 259.33.) The names of all the plaintiffs appear in

580

the heading of the notice of appeal. Paragraph 1 of the notice of appeal states that "Daniel B. Scully, Jr., and the other above named appellants hereby appeal," etc. The notice of appeal is signed, "Daniel B. Scully, Jr., et al. By: Sanford Olson, John E. Northrup, their attorneys." Appellee's contention is that this notice of appeal was not signed by or on behalf of any of the plaintiffs except Daniel B. Scully, Jr. However, we feel this is a super-technical objection and that their attorneys signed on behalf of all of the plaintiffs. The motion to dismiss is denied.

One of the errors assigned is the court's rejection of the offer of proof by Rose Scully, one of the appellants, and Richard Kavanagh, husband of one of the appellants, on the ground that they were incompetent to testify by reason of section 2 of the Evidence act, which provides that no party or person directly interested may testify when any adverse party sues or defends, among other things, as administrator, or heir of any deceased person. Wilhelm, in this suit, was defending individually, as heir, and as administrator of the estate of Mary Fagan. It is claimed by appellants that while, as to the validity of the marriage, Wilhelm was defending as heir of Mary Fagan, as to the validity of the deeds he was defending merely as grantee, or survivor of an estate in joint tenancy, and that, consequently, Rose Scully and Richard Kavanagh were competent witnesses as to the validity of the deeds. It is well settled that where an heir defends only as grantee, parties or persons directly interested are under no disability by reason of section 2 of the Evidence act. (*Simpson* v. *Wrate*, 337 Ill. 520; *Waters* v. *Lawler*, 297 id. 63; *DeCosta* v. *Bischer*, 287 id. 598.) The testimony excluded which is claimed to be material was an accusation made on January 2, 1932, before Wilhelm, that he was just after Mrs. Fagan's money, and a reply by Wilhelm that, as for her money he could buy and sell Mrs. Fagan; that her money meant nothing to him, but that he thought more of Mrs. Fagan

than did the whole bunch of Scullys put together. Appellants contend that this testimony went to the matter of fraud in the procurement of the deeds, because Wilhelm was practically penniless. However, it is our opinion that if this statement, made several months before the marriage, tended to show any fraud, it was fraud as to the marriage, and that the offer was properly refused.

The chancellor also rejected appellants' offer of proof as to Wilhelm's relations and dealings with Mary Dean. The purpose of this offered testimony was to show the conspiracy alleged in the complaint, and that Wilhelm's avowal of love for Mrs. Fagan was a hollow mockery. The chancellor rejected the offer because it contained no protestation of love for Mrs. Dean. Occasional reference to Wilhelm by neighbors as "Dame Dean's gigolo," one introduction of him as Mrs. Dean's "boy-friend," and her addressing him as "darling Augie," when they were both partially intoxicated, do not amount to a protestation of love by Wilhelm, and the offer was properly rejected. Moreover, there was no proof of any fraud upon Mrs. Fagan, and, until there was, evidence of a collateral transaction was inadmissible.

After all the evidence had been taken and the verdict of the jury returned, Sanford Olson, attorney for appellants, presented an affidavit asking leave to introduce additional evidence. It stated that several of the plaintiffs would testify as to Mrs. Fagan's insanity and as to Wilhelm's fraud in effecting the marriage. It was also stated that witnesses would testify that Wilhelm protested love to Mary Dean. The court rejected the affidavit for the reason that appellants should have made this offer of proof at the time of the trial and that it was too late after the verdict of the jury had been returned. This is assigned as error. Appellants rely on *Kelly* v. *Kelly,* 126 Ill. 550, in which it is stated that in a chancery case, where the verdict of the jury is merely advisory, the court has a right, "as a matter of course," to hear additional evidence at any time before the final decree.

They argue that while it is discretionary with the court as to whether it will hear additional evidence, the discretion is a judicial one which was abused in this case. However, there was no showing that this testimony was not available at the time of the trial, nor was there any excuse given for not presenting it at that time. Under such circumstances, the chancellor was under no duty to permit appellants to introduce additional testimony.

The trial court directed the jury to find for the defendant on the question of whether the deeds were fraudulently procured. The reason given by the trial court was that the complaint alleged, as the sole reason for setting aside the deeds, that they were procured by fraud, false pretenses and without consideration; that it was not alleged that Mrs. Fagan was insane at the time of the execution of the deeds and that there was no evidence of fraud. The trial court was correct in so holding. While in the early part of the complaint it is stated that Mrs. Fagan was insane at time of the marriage and that such insanity continued and increased until her death, insanity was not alleged as a ground for setting aside the deeds. The allegation was only that the deeds should be set aside because of the fraud, false pretenses and want of consideration. After the verdict had been returned, counsel for appellants moved the court for leave to amend the amended complaint to include an allegation of insanity at the time of the execution of the deeds. The court denied this motion for the reason that the purpose of the amendment was not to make the complaint conform to the proof as provided by the Civil Practice act. (Ill. Rev. Stat. 1937, chap. 110, par. 170 (3).) The court was correct in so holding.

Appellants contend that a fiduciary relation existed between Wilhelm and Mrs. Fagan and, therefore, there is a presumption that the deeds were obtained by fraud and undue influence, and that to overcome this presumption Wilhelm had the burden of proving by clear and convincing

evidence that the deeds were executed freely and voluntarily. However, no case has been called to our attention in which this contention was upheld and we have been able to find none. In *Spalding* v. *Spalding*, 361 Ill. 387, we held that the wife may deal with her separate property and may give it to her husband. We there said that while the court will scrutinize the transaction carefully, if it is fair and reasonable and the gift is not procured by fraud or imposition it will be enforced. While it may be true that a fiduciary relation exists between husband and wife, there is no showing, here, that Wilhelm was the dominant party in that relation. There is positive evidence of Whipp and Boyajian that Mrs. Wilhelm intended to make a gift of this property to Wilhelm and that she intended it to be a surprise to him. The chancellor was correct in refusing to set aside the deeds.

Appellants further contended that the court erred in refusing to admit evidence as to the inconsistent statements given by Wilhelm as to the circumstances of Mrs. Fagan's sudden death. They claim that the circumstances of her death are a part of the *res gestae*. We cannot uphold this contention. Her death was not in issue and the evidence was properly excluded.

After a consideration of all the evidence, we are of the opinion that the chancellor was warranted in dismissing the bill for want of equity. The evidence is very conflicting as to Mrs. Fagan's sanity, and in such case the finding of the jury, supported by the decree of the chancellor, will not be disturbed unless clearly against the preponderance of the evidence. *Arliskas* v. *Arliskas*, 343 Ill. 112.

The decree is affirmed.                   *Decree affirmed.*