FLORENCE S. THOMSON, as Executrix of SAMUEL C. THOMSON, Deceased, Appellant, *v.* NEW YORK TRUST COMPANY, Respondent.

Argued February 28, 1944; decided June 8, 1944.

*Allen T. Klots, Lee J. Perrin, Peter H. Kaminer* and *John R. Davison* for appellant.  I. The record contains many facts justifying a verdict that the defendant was on notice that Mrs. Roberts was acting without authority (*Grace* v. *Corn Exchange Bank Trust Co.,* 287 N. Y. 94; *Wen Kroy R. Co.* v. *Public Nat. Bank & T. Co.,* 260 N. Y. 84; *Lesem* v. *Mutual Life Insurance Co.,* 164 App. Div. 507; *Jennings* v. *President & Directors of Manhattan Co.,* 203 App. Div. 802; *Sims* v. *U. S, Trust Co. of New York,* 103 N. Y. 472.)  II. The Appellate Division erroneously assumed that the evidence of notice could not be cumulative (*Fidelity & Deposit Co.* v. *Queens Co. Trust*

*Co.,* 226 N. Y. 225; *Isaac* v. *Town of Queensbury,* 277 N. Y. 37; *Grace* v. *Corn Exchange Bank Trust Co.,* 287 N. Y. 94.) III. The notice received by the bank did not depend on the composite knowledge of several employees, because the important facts were all combined in the consciousness of a single offcer of the bank. (*Grace* v. *Corn Exchange Bank Trust Co.,* 287 N. Y. 94.) IV. The defendant could not rely on the powers of attorney when it was on notice that Mrs. Roberts was acting without her employer's authority. (*Franham Distributors* v. *New York World's Fair 1939,* 124 F. 2d 82; *Wen Kroy R. Co.* v. *The Public Nat. Bank & Tr. Co.,* 260 N. Y. 84; *Bischoff* v. *Yorkville Bank,* 218 N. Y. 106; *Fidelity & Deposit Co.* v. *Queens Co. Trust Co.,* 226 N. Y. 225; *Rochester & C. T. R. Co.* v. *Paviour,* 164 N. Y. 281; *Critten* v. *Chemical Nat. Bank,* 171 N. Y. 219; *Basch* v. *Bank of America National Trust & Savings Association,* 139 Pac. 2d 1.) V. The Appellate Division erred in holding that depositor's failure to examine the bank's statements sent to his office barred recovery as a matter of law. (*Henry* v. *Allen,* 151 N. Y. 1; *Mutual Life Ins. Co.* v. *Hilton-Green,* 241 U. S. 613; *Hurley* v. *John Hancock Mut. Life Ins. Co.,* 247 App. Div. 547; *Smith* v. *John Hancock Mut. Life Ins. Co.,* 260 App. Div. 990; *Critten* v. *Chemical Nat. Bank,* 171 N. Y. 219; *Irving Trust Co.* v. *National City Bank of New York,* 78 F. 2d 665; *Gutfreund* v. *East River Nat. Bank,* 251 N. Y. 58; *Basch* v. *Bank of America National Trust & Savings Assn.,* 139 Pac. 2d 1; *Fidelity & Cas. Co.* v. *Farmers Nat. Bank,* 275 N. Y. 194; *Morgan* v. *U. S. Mortgage & Trust Co.,* 208 N. Y. 218; *Frank et al.* v. *Chemical Nat'l Bank of N. Y.,* 84 N. Y. 209; *Leather Manufacturers' Bank* v. *Morgan,* 117 U. S. 96.) VI. In no event did the defendant have a right to deduct, after decedent's death, $75,000 from his balances of cash and securities in payment of the forged note (*Nassau Bank* v. *Nat. Bank of Newburgh,* 159 N. Y. 456; *Stephens* v. *Board of Education,* 79 N. Y. 183; *Justh et al.* v. *Nat. B'k of the Commonwealth,* 56 N. Y. 478; *Southwick* v. *First Nat'l Bank of Memphis,* 84 N. Y. 420; *G. N. Bank* v. *State,* 141 N. Y. 379; *Hatch* v. *National Bank,* 147 N. Y. 184; *Ball* v. *Shepard,* 202 N. Y. 247; *Carlisle* v. *Norris,* 215 N. Y. 400; *Aneless Corporation* v. *Woodward,* 262 N. Y. 326.)

*Alfred A. Cook, J. Adam Murphy* and *Henry Cohen* for respondent. I. Depositor's own failure to examine the statements rendered by the trust company bars recovery. (*Potts & Co.* v. *Lafayette Nat. Bank*, 269 N. Y. 181; *National Surety Co.* v. *Manhattan Co.*, 252 N. Y. 247; *Prudential Ins. Co.* v. *Nat. Bank of Commerce*, 227 N. Y. 510; *Critten* v. *Chemical Nat. Bank*, 171 N. Y. 219; *Morgan* v. *U. S. Mortgage & Trust Co.*, 208 N. Y. 218; *Fredericks* v. *National City Bank of New York*, 155 Misc. 800, 245 App. Div. 704; *Empire Trust Co.* v. *Cahan*, 274 U. S. 473; *Corporation Agencies Ltd.* v. *Home Bank of Canada*, 1927 A. C. 318; *Screenland Magazine* v. *National City Bank*, 42 N. Y. S. 2d 286.) II. The trust company was not liable in the absence of guilty participation by it in Mrs. Roberts' thefts. (*Bischoff* v. *Yorkville Bank*, 218 N. Y. 106; *Grace* v. *Corn Exchange Bank Trust Co.*, 287 N. Y. 94; *Stark* v. *National City Bank*, 278 N. Y. 388; *Massachusetts Bonding & Ins. Co.* v. *Standard Trust & Savings Bank*, 334 Ill. 494; *Allen* v. *Puritan Trust Co.*, 211 Mass. 409; *New Amsterdam etc. Co.* v. *National Newark etc. Co.*, 117 N. J. Eq. 264, 119 N. J. Eq. 540; *Atlanta & St. A. B. Ry. Co.* v. *Barnes*, 95 F. 2d 273; *The President etc.* v. *Cornen*, 37 N. Y. 320; *Bradford Co.* v. *Dunn*, 250 N. Y. 461; *Cluett* v. *Couture*, 140 App. Div. 830, 206 N. Y. 668; *McCabe Hanger Mfg. Co.* v. *Chelsea Ex. Bank*, 183 App. Div. 441; *Empire Trust Co.* v. *Cahan*, 274 U. S. 473; *Oquendo* v. *Federal Reserve Bank of New York*, 98 F. 2d 708; *Kiekhoefer* v. *United States National Bank of Los Angeles*, 39 Pac. 2d 807; *Craig* v. *Anyon*, 212 App. Div. 55, 242 N. Y. 569; *Saugerties Bank* v. *Delaware & Hudson Co.*, 236 N. Y. 425.) III. There is no evidence to support the jury's finding that the trust company received notice or was negligent on November 18, 1936. (*Youngs* v. *Perry*, 42 App. Div. 247; *Oquendo* v. *Federal Reserve Bank of New York*, 98 F. 2d 708; *Kiekhoefer* v. *United States National Bank of Los Angeles*, 39 Pac. 2d 807; *Clarke* v. *Public Nat. Bank & Trust Co.*, 259 N. Y. 285; *Grace* v. *Corn Exchange Bank Trust Co.*, 287 N. Y. 94; *Bischoff* v. *Yorkville Bank*, 218 N. Y. 106; *American Surety Co.* v. *Empire Trust Co.*, 262 N. Y. 181; *Glassell Dev. Co.* v. *Citizens National Bank*, 191 Cal. 375; *Andrews* v. *Northwestern Nat. Bank*, 107 Minn. 196.) IV. Appellant's claims of notice to the trust company prior to

November 18, 1936, are not supported in law and are without substance as the jury properly found. There is no basis for appellant's claim that all the evidence should have been cumulated on November 18, 1936. (*Republic Supply Co. of California* v. *Richfield Oil Co.*, 79 F. 2d 375; *Bischoff* v. *Yorkville Bank*, 218 N. Y. 106.) V. In any event the Appellate Division properly rendered final judgment based upon the finding of the jury that no notice was received before November 1936. (*Cuff* v. *Dorland*, 57 N. Y. 560; *Outwater* v. *Moore*, 124 N. Y. 66; *Farleigh* v. *Cadman*, 159 N. Y. 169; *Lopez* v. *Campbell*, 163 N. Y. 340; *Schoenherr* v. *Van Meter*, 215 N. Y. 548; *Perkins* v. *Guaranty Trust Co.*, 274 N. Y. 250; *Loomis* v. *Lehigh Valley R. R. Co.*, 208 N. Y. 312; *Wilson* v. *Mechanical Orguinette Co.*, 170 N. Y. 542; *Nau* v. *Vulcan Rail & Construction Co.*, 286 N. Y. 188; *Kosiba* v. *City of Syracuse*, 287 N. Y. 283.) VI. The trust company properly enforced payment of the $75,000 loan. (*Hathaway* v. *County of Delaware*, 185 N. Y. 368; *In Re Brainard Hotel Co.*, 75 F. 2d 481; *Whiting* v. *Hudson Trust Co.*, 234 N. Y. 394; *Herlihy* v. *Independence State Bank*, 261 N. Y. 309; *The Kingston Bank* v. *Eltinge*, 40 N. Y. 391.)

LEWIS, J. After the death of Samuel C. Thomson in July, 1940, the present plaintiff called upon the defendant Trust Company to pay over to her as executrix of the decedent's will the cash which he had on deposit and securities which the defendant then held to his credit for safe keeping. Responding to that demand the defendant delivered all cash and securities which then stood to the credit of the decedent upon its books, the total value of which was $731,971.46 less than the amount which the executrix claimed was due from the defendant. Subsequent investigation revealed that over a period of more than ten years the difference between the amount of cash and securities claimed by the executrix to be due from the defendant and the amount standing to the decedent's credit on the defendant's books, had been stolen by the decedent's secretary. The question between the executrix and the trust company as to the legal responsibility for the loss led to the present action.

Upon the trial the plaintiff contended that the defendant breached obligations which it owed as a depositary when it failed to deliver to the plaintiff as executrix the amount which

she claimed to be due the decedent. In defense of such charge the Trust Company contended that it had performed its full legal duty when it paid over to the plaintiff all cash and securities which it held to the credit of the decedent at the time of his death; that the items of cash in the amount of $140,902.04 and securities of the value of $591,069.42 demanded by the executrix in excess of cash and securities delivered to her by the defendant had been paid out and delivered by the Trust Company to the decedent's secretary, Mrs. Mary B. Roberts, on the authority of formal powers of attorney executed by the decedent and delivered by him to the Trust Company; that during all the time while the decedent had one or more accounts with the Trust Company it had sent to him each month, at the address he had designated, written statements showing all debit and credit items and the current condition of each account; that the loss sustained by the decedent and his estate was due to embezzlement by his agent and his own failure to examine the monthly bank statements which showed in detail the condition of his accounts.

The plaintiff did not dispute the proof that over a period of years Mrs. Roberts appropriated to her own use the cash and securities which the decedent's estate is endeavoring by this action to recoup from the defendant bank. It was not contended that any of the officers or employees of the bank had actual knowledge that Mrs. Roberts was stealing the decedent's cash and securities. There is no claim that the bank through its officers or employees was guilty of co-operating in the theft. Nor did the plaintiff assert that the bank acted in bad faith in any instance. It was the plaintiff's position that in a long course of dealing with Mrs. Roberts as the decedent's attorney in fact the bank's officers gained knowledge of facts which in the exercise of reasonable care would have put a banker on notice that her acts were in excess of the authority reposed in her by the decedent. In short the plaintiff's claim upon the trial was that the defendant bank is legally responsible for the loss sustained by the decedent because it negligently failed to heed facts within its notice which should have apprised it that Mrs. Roberts' dealings were irregular.

At the close of the trial, although the jury was not instructed to return a special verdict, the foreman in announcing the

verdict stated — " We find that the defendant is chargeable with notice on November 18, 1936, and we therefore find for the plaintiff in the sum of $271,788.38." The figure last mentioned was the computed sum furnished to the jury as the plaintiff's claim for damages if the jury should find that the bank first had notice of Mrs. Roberts' dishonesty on November 18, 1936. The figure was said to represent the total of Mrs. Roberts' misappropriations after that date. No objection to the form of the verdict was interposed by the plaintiff; no motion was made by the plaintiff to set aside the verdict and the plaintiff took no appeal from the judgment entered thereupon. The defendant appealed to the Appellate Division where the judgment of the Trial Term was reversed on the law and facts and the complaint was dismissed, one justice dissenting.

The decedent, a mining engineer, employed Mrs. Mary B. Roberts as his secretary in 1922. At first she was given charge over minor details of his financial affairs. As years passed he entrusted to her more important transactions involving the disposition of his securities and related matters. In the year 1928 she exercised authority so extensive that, by an order which was signed " S. C. Thomson by M. B. Roberts " she instructed the defendant bank to lend from the decedent's funds $200,000 " on call." The decedent consulted Mrs. Roberts frequently as to the state of the security market and during his long absences from New York City he inquired frequently by correspondence as to details of his financial problems with which she was familiar. It was not until May 16, 1930, after he had opened a " custodian account " with the defendant, that he executed the following formal power of attorney which gave her broad authority to deal with his securities:

" THE NEW YORK TRUST COMPANY,
   100 BROADWAY
     NEW YORK, N, Y.

DEAR SIRS:

I hereby authorize and request you to follow any and all instructions, whether written or oral, given you by ........ M. B. Roberts ........ of ........ specimen signature of whom appears below, in respect to the sale or exchange of any or all of the securities which you, as Custodian or otherwise, now or in the future may hold for my account, the transfer, delivery

or other disposition of said securities, including delivery of said securities to my attorney himself, the investment of any cash which you, as Custodian or otherwise, may at any time hold for my account, and the purchase or acquisition by exchange or otherwise, of securities in my behalf, granting unto my said attorney full power and authority in the premises, ratifying and confirming all that he shall do or cause to be done by virtue hereof.

Very truly yours,<br>SAMUEL C. THOMSON.

Specimen signature of
M B Roberts
May 16, 1930.''

On October 23, 1931, while the first power of attorney was outstanding, the decedent gave to Mrs. Roberts a second power of attorney which covered not only his checking account but authorized her, among other functions, to borrow '' in (his) name '' from the defendant on promissory notes such sums as she might think proper and to pledge as collateral security therefor '' any and all  *  *  *  securities held by (him) or by (her) ''.

By dishonest use of these two powers of attorney from 1930 until 1940 and by other means presently to be considered Mrs. Roberts embezzled more than $700,000 of the decedent's funds and the securities over which he had given her control. This embezzlement was accomplished in the following manner: The decedent kept his personal check book in his own possession. He made out his own checks and followed in detail the written statements — called '' white sheets '' —which were prepared and delivered to him each month by Mrs. Roberts. He was given to understand by Mrs. Roberts that these '' white sheets '' reflected the entries which appeared upon statements sent each month to the decedent by the defendant bank. Upon the '' white sheets '' appeared transactions involving the purchase or sale of securities, the receipts from various sources and the debits caused by checks which had been cashed during the month. The decedent also received from Mrs. Roberts periodically '' blue sheets '' which purported to contain a list of his stocks and bonds. These statements — '' white sheets '' and '' blue sheets '' — were examined with care by the decedent. Indeed, there were

occasions when he detected errors and supervised their correction. But since his death the decedent's complete trust in his agent has been proved misplaced. Upon the trial uncontradicted evidence demonstrated that from the beginning of her thefts in 1930 the statements made by Mrs. Roberts to the decedent and various account books which were under her control were falsified to conceal embezzlement.

We come then to an item of undisputed evidence upon which the defendant lays stress and which, it is said, goes far to absolve the defendant from liability herein. During all the period of years while his agent was appropriating his funds to her own use the decedent did not examine any one of the monthly statements sent to him by the defendant bank. These statements, regularly furnished by the defendant, contained advice to the decedent of all debits and credits and all transactions affecting his bank accounts during the month involved. There is undisputed testimony by a witness called by the plaintiff that if, in connection with Mrs. Roberts' statements, the decedent had examined any one of the monthly bank statements sent to him by the defendant, it would have disclosed her dishonesty. He chose, however, to disregard the information thus made available to him and to rely solely upon statements prepared by Mrs. Roberts.

Our inquiry upon this appeal goes to the question whether there are facts of record before us which afford a legal basis for requiring the defendant bank to make good the loss suffered by the decedent's estate due to his misplaced confidence in his own agent.

As appellant before us the plaintiff answers that inquiry in the affirmative and cites evidence of two transactions which, it is said, served to put the defendant bank on notice that the decedent's agent was acting without authority. The reference is to evidence of the occasion on April 26, 1932, when Mrs. Roberts did not have in her personal account sufficient funds to meet the payment of an outstanding check. To avoid an overdraft she exercised one of the powers of attorney on file with the defendant and gave written instruction to the bank to transfer $2,000 from the decedent's account to her own. Within the following eighteen months she drew a number of checks upon the decedent's account which were payable to her own order and were deposited in her own account with the defendant. During this period Mrs. Roberts also paid from her own account

a number of bills rendered to the decedent and made payments into a joint account maintained by the decedent with an associate. Upon the trial Mrs. Roberts testified that in October or November 1933, an officer of the bank called her by telephone and " said that I was drawing too many checks to my own order on Mr. Thomson's account, that it was unusual and would have to stop. He also said that in the future Mr. Thomson would have to sign all checks that were drawn to my order." Thereafter she drew no more checks upon the decedent's account to her own order. In his charge to the jury the Trial Justice submitted it as a question of fact whether these transactions by Mrs. Roberts in 1932 and 1933 were of such a character as to give notice to the bank that she was going beyond the apparent authority afforded by the powers of attorney in her favor which the decedent had delivered to the bank. The jury's verdict proclaims, as we have seen, a finding that the transactions of 1932 and 1933 did not give notice to the defendant of Mrs. Roberts' wrongdoing. In view of that circumstance and in the absence of an appeal by the plaintiff from the judgment entered upon the jury's verdict, we think that evidence of transactions which antedated November 18, 1936, affords no basis for reversal of the judgment now before us.

The appellant also contends, and the jury found, that on November 18, 1936, the defendant was given notice that Mrs. Roberts was acting beyond the authority given to her by the decedent. On that date she borrowed $75,000 from the defendant. The loan was made upon a promissory note which bore the decedent's name. As a part of the transaction the proceeds of the note were credited by the defendant directly to the decedent's personal account and thereafter they were withdrawn on checks signed by the decedent personally. It follows that neither the decedent nor his estate suffered loss from the transaction. But we are told that the signature of the decedent, which concededly was traced upon the note by Mrs. Roberts, was a " clumsy forgery " and that the defendant was negligent in its failure to detect the simulation. This contention, we think, disregards the fact that when the loan was the subject of preliminary discussion, and when later it was consummated, there was in the defendant's files a power of attorney whereby the decedent constituted Mrs. Roberts as " his true and lawful

attorney " to borrow from the bank in his name such sums as she thought proper and to pledge his or her securities for such loans. It is statute law of this state that " The signature of any party may be made by a duly authorized agent." (Negotiable Instruments Law, § 38.) Mrs. Roberts was the decedent's duly authorized agent. She signed his name to a promissory note as she was expressly authorized to do by the power of attorney then lodged with the bank. (See *Oquendo* v. *Federal Reserve Bank of New York,* 98 F. 2d 708, cert. denied 305 U. S. 656; *Cluett* v. *Couture,* 140 App. Div. 830, 832, affd. 206 N. Y. 668; 96 A. L. R. 1251.) That note so signed was productive of $75,000, all of which the defendant bank was directed to credit and did credit to the personal account of the decedent. We find no evidence upon which could rest a finding of lack of due care by the defendant's officers in accepting from Mrs. Roberts the note of November 18, 1936, nor is the evidence relating to that transaction sufficient to support a finding that the conduct of Mrs. Roberts was such as to arouse suspicion and to put the bank's officers on notice of her perfidy.

We think the Appellate Division was correct in its ruling that the decedent was under a legal duty to examine the monthly statements showing the condition of his accounts, and that, in the circumstances disclosed by this record his failure to do so barred recovery in this action. The following testimony given by one of the plaintiff's witnesses stands uncontradicted: " * * * It is a fair statement of fact that when there was a discrepency between Mr. Thomson's actual balance and the balance that appeared on these white sheets that he would have detected that discrepency if he had examined his bank statements." In *Potts & Co.* v. *Lafayette Nat. Bank* (269 N. Y. 181) this court had occasion to review a record of evidence with features similar to the case at bar. In ruling upon the question now before us the court said (per LEHMAN, J.) pp. 186–187: " * * * an examination by the plaintiff of the monthly statement of its account with the bank would have disclosed that the plaintiff had not received credit for checks which it had endorsed to the order of the bank. A depositor of a bank is under a duty to examine such statements of account, and to give notice of errors therein." (See, also, *Critten* v. *Chemical Nat. Bank,* 171 N. Y. 219, 227–230;

*Prudential Ins. Co.* v. *Nat. Bank of Commerce,* 227 N. Y. 510, 521; *National Surety Co.* v. *Manhattan Co.,* 252 N. Y. 247, 256; *Morgan* v. *U. S. Mortgage & Trust Co.,* 208 N. Y. 218, 223–228; *Empire Trust Co.* v. *Cahan,* 274 U. S. 473, 479, 480.) When in the present case the decedent chose to delegate that duty to another and entrusted to Mrs. Roberts the examination of monthly statements of his accounts, which were concededly furnished regularly by the bank, his estate may not now charge the bank with the loss which ensued and which was due to his misplaced confidence in his agent.

Finally, the appellant argues that the Appellate Division erred in dismissing the complaint because, in any event, the defendant bank was not entitled to deduct from the decedent's balances the sum of $75,000 on account of the note which was negotiated by Mrs. Roberts on November 18, 1936. At Trial Term this question was not submitted to the jury and counsel for the plaintiff did not ask for such submission. As the question now sought to be raised by the appellant was not preserved by exception it is not open for consideration by this court. (*Pangburn* v. *Buick Motor Co.,* 211 N. Y. 228, 235; *Heela Powder Co.* v. *Sigua Iron Co.,* 157 N. Y. 437, 441.)

The judgment should be affirmed, with costs.

Conway, J. (dissenting). When the decedent, Samuel C. Thomson, retired in 1930, he delivered all of his securities to the defendant Trust Company under a custodial agreement providing for payment of stipulated fees by him. In his checking account with the Trust Company he kept all of his cash. From 1922 until 1940 the decedent employed as part-time secretary one Mary B. Roberts who was also employed by one of his former associates and by a mining corporation in whose office he had rented a room. Mrs. Roberts kept his books except his check book which he always retained in his possession.

Beginning on May 9, 1930, Mrs. Roberts systematically appropriated Mr. Thomson's cash and securities. The larcenies continued until his death in 1940 and at that time totaled $140,902.04 of the cash and $519,069.42 of the securities. The thefts were accomplished under two powers of attorney, dated May 13, 1930 and October 23, 1931. During the entire period from

1930 to 1940 Mr. Thomson never asked either Mrs. Roberts or the Trust Company to enter into any transaction which involved or necessitated delivery of any securities to Mrs. Roberts. The first power of attorney authorized the Trust Company to follow the instructions of Mrs. Roberts for the sale, purchase and delivery of Mr. Thomson's securities, including delivery to herself. The second power of attorney gave Mrs. Roberts a signing power on Mr. Thomson's checking account but contained no provision expressly authorizing her to draw checks to her own order and Mr. Thomson never requested her to draw any checks under that power of attorney.

Under the first power seventy-two separate lots of securities were delivered directly to Mrs. Roberts by the Trust Company at her request and against her receipt and were stolen by her. Other unauthorized transactions resulted from Mrs. Roberts' effort to conceal her theft. Such transactions consisted of the Trust Company's use of funds in Mr. Thomson's checking account at the direction of Mrs. Roberts to purchase securities when it became necessary for her to replace them in Mr. Thomson's account in order to conceal the prior thefts. Still other unauthorized transactions consisted of the Trust Company's sale of Mr. Thomson's securities at Mrs. Roberts' direction to obtain cash to replenish the checking account and thus conceal prior thefts from that account. In addition, Mrs. Roberts forged Mr. Thomson's name to a note and a loan agreement in the face amount of $75,000 and the Trust Company, accepting the signatures as those of Mr. Thomson, deposited that sum in his account and thus enabled Mrs. Roberts to conceal the fact that she had taken approximately an equivalent amount from the checking account.

During the greater part of the ten-year period preceding his death, Mr. Thomson practically never came to his office or transacted any business there. Consequently he never saw or inquired about the statements rendered by the Trust Company of his checking and securities accounts. They were sent by the Trust Company to his office. Mrs. Roberts kept a fictitious system of accounts referred to in the prevailing opinion as " white sheets " and " blue sheets ". Those " blue " and " white " sheets were forwarded thereafter by Mrs. Roberts

to the decedent. That practice continued until the death of Mr. Thomson when the thefts were discovered and Mrs. Roberts sentenced to a State prison upon her confession of guilt.

The question presented for determination is whether the Trust Company had notice that Mrs. Roberts was dealing with the cash and securities without authority and if so, as of what date. If the Trust Company was chargeable with such notice then it could not rely upon the powers of attorney as a defense after the date on which it was found that the Trust Company had such notice.

To put it in another way, the Trust Company had contracts with the decedent as to his money on deposit and as to his securities on deposit. Mrs. Roberts had no authority *in fact* to draw either cash or securities for the purpose of appropriating them. The Trust Company did not perform its contracts in paying out the cash and delivering the securities unless it had a right to rely at the time of so doing on some *apparent* authority of Mrs. Roberts to receive them.

The Appellate Division found *as a matter of law* that there was no evidence from which a jury could have found that the Trust Company was chargeable with notice that Mrs. Roberts was acting without authority. It also found that Mr. Thomson's failure to examine the statements of his accounts which the Trust Company sent periodically to his office was negligence *as a matter of law* and that such negligence prevented the plaintiff from recovering. The Appellate Division also held *as a matter of law* that the Trust Company was not negligent.

The plaintiff was entitled to a jury trial and it seems to us that whether the decedent was negligent and whether the Trust Company did or did not have notice were both *questions of fact.*

We shall first consider the facts which came to the attention of the Trust Company from which we think a jury could determine, as indeed it did, that the Trust Company was charged with notice that Mrs. Roberts was acting without authority.

In 1932 and 1933 Mrs. Roberts drew eighteen checks without the knowledge of Mr. Thomson and of which he never learned. Two of them were paid in cash over the counter by the paying teller. The other sixteen were deposited in her own account with the Trust Company to cover overdrafts existing *in her*

*account* at the time. The two checks which were cashed totaled $700. The others varied in amount from $200 to $1,500. Each of the eighteen checks was drawn to the order of Mrs. Roberts. Each of the sixteen checks was credited by the Trust Company to Mrs. Roberts' account at a time when it was in overdraft as shown by the red figures and the letters " O. D." appearing on the ledger of the Trust Company.

That conduct was not only calculated to put the Trust Company on notice that Mrs. Roberts was acting without authority, but the evidence discloses that the Trust Company became conscious of the situation. Late in November, 1933, Mr. Hovey, the assistant vice-president, advised Mrs. Roberts that she was drawing too many checks to her own order on Mr. Thomson's account; that such a practice was unusual and would have to cease and that in the future Mr. Thomson, himself, would have to sign all checks so drawn. Thereupon, Mrs. Roberts abruptly ceased drawing checks to her own order on Mr. Thomson's account.

The assistant vice-president who took up this matter had formerly been the treasurer of defendant and the credit file shows that Mr. Thomson's account had been " assigned " to him. He was in charge both of Mr. Thomson's account and Mrs. Roberts' account. That assistant vice-president had written into the credit file ten months before, the following: " 1933

February 8th : —

Memo from Mr. Hovey :— I called at the office of S. C. Thomson and found that he is now in Florida and will not return to the city until April. He is not in good health and spends practically all of his time away from the city, coming here for a short time in the spring and in the fall."

The notification by the assistant vice-president was in the latter part of November, 1933. It could be inferred that the notification was the result of two transactions by Mrs. Roberts. The first on October 26, 1933, when she deposited a check on Mr. Thomson's account for $1,000 to cover an overdraft in her account. That deposit slip bears Mr. Hovey's initials so that it is evident that someone was suspicious and insisted that an officer of defendant approve the transaction before he

put it through. The overdraft in that instance was $10.95. On November 21, 1933, Mrs. Roberts deposited another check drawn on Mr. Thomson's account for $1,500, to cover an overdraft of $1,400.39 in her account. It was then that Mr. Hovey notified Mrs. Roberts that thereafter checks drawn to her order on Mr. Thomson's account had to be signed by him personally. It is well to bear in mind at this point three facts: One, Mrs. Roberts' was an account of small balances — frequently less than one hundred dollars. Two, she had never deposited with the bank any collateral as security for any indebtedness by her to the bank. Three, that the overdrafts were "numerous". (See *Grace* v. *Corn Exchange Bank Trust Co.*, 287 N. Y. 94, 107.)

The defendant's credit file also, under date of February 8, 1933, carried the following note:

"* * * I asked Mrs. Roberts if Mr. Thomson was still Vice-President of the Noranda Mines and also what chances we had of obtaining a portion at least of this business, reminding her that at one time we had their only account in New York. She said that Mr. Thomson continues as Vice-President and that she would be very glad to ask him to use his influence to reinstate this account with us. * * *

"This is our only contact and I shall follow the matter up in April."

The defendant's records show that the account of Mrs. Roberts was assigned to the same Mr. Hovey and that on those records there is the following notation: — "See to S. C. Thomson Do not disturb."

Just who was not to be disturbed is not entirely clear. A jury could certainly find it was Mrs. Roberts. If *Mr. Thomson* had been disturbed in late November, 1933, however, subsequent losses of over $450,000 would have been prevented.

On October 31, 1936, the actual balance in Mr. Thomson's checking account was about $9,000. Five days later Mrs. Roberts sent to Mr. Thomson a statement on the "white sheets" showing that his October 31st balance had been approximately $81,000. There was thus a shortage of $72,000. Thereupon Mrs. Roberts forged Mr. Thomson's signature on a $75,000 promissory note to the Trust Company and also on a special

loan agreement with the Trust Company. Both were dated November 18, 1936. The forgeries were committed by tracing over a genuine signature of Mr. Thomson through a piece of carbon paper and by then going over the carbon tracing with ink and then rubbing off the carbon. We think it is fair to say that a comparison of the signatures on that promissory note and special loan agreement with the signatures on checks signed by Mr. Thomson at about that time would have disclosed even to the eye of inexperience that this was palpably a clumsy forgery. The handwriting expert, Mr. Osborn, characterized it as " a very poor reproduction ". It was the duty of the defendant to know Mr. Thomson's signature. And it was obligated to know that the signature so presented was spurious.

The note was presented to the same assistant vice-president and was discussed with him. This was the same Mr. Hovey who had been so concerned with Mrs. Roberts' overdrafts in her own account and the covering of those overdrafts by checks drawn by her upon Mr. Thomson's account that he told her to stop them and obtain instead checks signed by Mr. Thomson personally. No such checks signed by Mr. Thomson had ever thereafter been presented drawn to the order of Mrs. Roberts. Now there were presented two clumsily forged papers. True, Mrs. Roberts had the right to sign those papers as attorney under her power of attorney. That authorized signature was as shown on the signature card of the bank " S. C. Thomson by M. B. Roberts, attorney." That signature card referred to the power of attorney and expressly stated what the authorized form of signature was to be. The assistant vice-president was concerned over the transaction. He asked Mrs. Roberts what Mr. Thomson wished to do with the money and Mrs. Roberts replied that the loan was for the purpose of purchasing securities. To that the assistant vice-president said that that was too bad because of the amount of collateral that would be required and which was then taken from the custodial account.

The evidence is uncontradicted that the loan was unauthorized and that it was obtained by Mrs. Roberts to conceal her thefts and to make it possible for her to continue them. The one presenting the note in this instance had been stopped in practices which the bank felt were not proper ones by the same

man to whom she was now presenting the forged signature of her principal. Can we say that no jury could rationally find that the forgery was so clumsy as to put a banker on notice that something wrong was being done by Mrs. Roberts when the same individual officer had already forbidden previous questionable practices by her? In this instance there can be no claim that there was reliance upon the agent's apparent authority. The defendant acted in discounting the note upon the fact that it was the act of the principal and not that of the agent. The defendant affirmatively established that fact. That ends any question of apparent authority. (*Wen Kroy R. Co.* v. *Public Nat. Bank & T. Co.*, 260 N. Y. 84, 91, 92; *Ward* v. *City Trust Co.*, 192 N. Y. 61.)

The presentation of a forged signature of the decedent by Mrs. Roberts in this instance should have been doubly suspicious to this defendant's officer. First, because having two powers of attorney under which she had acted for five and six years respectively, why was she resorting to clumsy forgeries? Second, since the proceeds of the loan were going into Mr. Thomson's account, why should she attempt to conceal the fact that she had signed the note as she had a right to do?

The case of *Oquendo* v. *Federal Reserve Bank of New York* (98 F. 2d 708) is clearly distinguishable. There the plaintiff had given her attorney a broad power to receive the amount of her recovery and to indorse any check in payment thereof. The attorney received the check and deposited it in his own name as attorney. It bore an indorsement both of the plaintiff's name and his own name as attorney. In other words, the one presenting the check purported to act as agent. In addition the defendant bank was not one *which should have known the genuine signature* of the principal and therefore could not have been put on notice by any clumsy forgery of the principal's signature.

On December 6, 1937, the bank sent to Mr. Thomson's office a statement regarding the loan and the collateral and requested verification. No reply was received. On December 27, 1937, the defendant sent a duplicate statement. Again no reply was received. On March 28, 1938, the defendant wrote demanding the return of a statement " at once " regarding the $75,000

loan and the collateral pledged. No reply was received. A further request for verification of the loan dated April 6, 1940, was ignored.

Certainly a jury could find that at sometime between 1930 and 1940, these cumulating events put the defendant bank upon notice that Mrs. Roberts was acting without authority. (*Fidelity & Deposit Co.* v. *Queens Co. Trust Co.*, 226 N. Y. 225, 233; *Grace* v. *Corn Exchange Bank Trust Co.*, 287 N. Y. 94, 106, 107.)

The jury found that by November 18, 1936, sufficient facts had accumulated so that on that date the defendant was put upon notice that Mrs. Roberts was acting without authority and was embezzling the funds of her employer. We think that the jury could so find when all the important facts detailed *supra* were " combined in the consciousness of a single officer of the bank." (*Grace* v. *Corn Exchange Bank Trust Co.*, 287 N. Y. 94, 104.) While the defendant was asking Mr. Thomson to confirm its statement as to the $75,000 loan and the collateral therefor which had been taken from his custodial account and receiving no reply, Mrs. Roberts had so depleted Mr. Thomson's account that when he drew checks he would overdraw his account. Thus in March of 1939 Mr. Thomson's account showed an overdraft from March 3rd to March 6th in the sum of $9,094.49 and in May of 1939 an overdraft of $7,969.76. On such occasions the defendant would *notify Mrs. Roberts* by telephone who would then order the sale of securities from the custodial account and thus cover the overdraft and avoid the danger of her exposure.

This action is in contract. There were two contracts, the ordinary contract which every depositor has with a bank and a written contract under which the bank accepted Mr. Thomson's securities for safekeeping. Under those contracts Mr. Thomson's cash was to be paid out and his securities to be delivered only on his own order or that of his authorized agent. If one knows or is put upon notice that the agent is acting without actual authority, no reliance may be placed on any apparent authority.

The rule is stated in the Restatement of the Law of Agency:

" § 166. Third Persons Having Notice of Limitation of Authority.

" If a third person has notice of the limitation of an agent's authority, he cannot subject the principal to liability upon a transaction with the agent in violation of such limitation.

" Comment: a. If a third person has such information as would lead a reasonable man to believe that the agent is violating the orders of the principal or that the principal would not wish the agent to act under the conditions known to him, he cannot subject the principal to liability. Any substantial departure by an agent from the usual methods of conducting business is ordinarily a sufficient warning of lack of authorization." Again, in Mechem, Law of Agency, section 752, at page 534, it is stated: " Persons dealing with agent must exercise reasonable prudence.— The person dealing with the agent must also act with ordinary prudence and reasonable diligence. Obviously, if he knows or has good reason to believe that the agent is exceeding his authority, he can not claim protection. So if the suggestions of probable limitations be of such a clear and reasonable quality, or if the character assumed by the agent is of such a suspicious or unreasonable nature, or if the authority which he seeks to exercise is of such an unusual or improbable character, as would suffice to put an ordinarily prudent man upon his guard, the party dealing with him may not shut his eyes to the real state of the case, but should either refuse to deal with the agent at all, or should ascertain from the principal the true condition of affairs."

This is particularly true when we consider the forged indorsement of Mr. Thomson. The language in *Wen Kroy R. Co.* v. *Public Nat. Bank & T. Co.* (LEHMAN, J., 260 N. Y. 84, at pp. 91, 92) seems particularly applicable.

The situation was aptly described in *Franhan Distributors* v. *New York World's Fair 1939* (CHASE, J., 124 F. 2d 82, 85.) " The unperformed duty of inquiry may, and often does, make it impossible to rely upon any so-called apparent authority of an agent."

The lack of authority of Mrs. Roberts would have been disclosed by inquiry in connection with her conduct in 1933 which was improper enough to require affirmative action by the defendant. Inquiry in 1936 again would have disclosed her lack of authority.

It does not seem to us that it is an answer that the defendant was under no duty to determine whether the note bearing the traced signature of Mr. Thomson was signed by Mrs. Roberts or Mr. Thomson. Viewed academically, and apart from the circumstances of this case, that may be true. But in this case the defendant had *undertaken the duty* of determining whether instruments signed under the powers were signed by Mrs. Roberts or Mr. Thomson. The defendant had instructed Mrs. Roberts that checks drawn to her order by her *under the powers of attorney would not be honored by the bank but that such checks must be signed by Mr. Thomson personally. That was the reason Mrs. Roberts forged Mr. Thomson's name.* It does not seem to us that the defendant bank can now say that it was under no duty to determine whether the note was signed by the principal or by the attorney. Not only the signature card in the bank but the power of attorney itself and the forgery of the principal's name make applicable the language just referred to in the *Wen Kroy* case. It seems clear that a reasonably prudent banker would have been put upon inquiry either in 1933 or at sometime during the cumulative occurrences so that he would have made inquiry as to the authority of this secretary — and it was only as such that she was described on the records of the bank. This case is much stronger than the *Bischoff* and *Grace* cases where the liability sought to be imposed was a tortious one to a third person because the bank became a knowing participant with its depositor in a transaction that defrauded that third party. There knowledge approximating consciousness of guilt may well be required. This is not such a case. This is a case where the defendant is pleading that it performed contracts with its customer when it delivered securities and paid out money to the depositor's agent. The defendant had an affirmative duty to exercise vigilance and to exercise reasonable prudence and it could not avoid making inquiry when the conduct of the agent was such as to arouse the suspicion of a responsible officer and cause him to forbid the continuance of such conduct. It is true that the jury did not fix that occurrence in 1933 as the one which finally put the defendant on notice that the authority of Mrs. Roberts was being exceeded but instead fixed the date of November 18, 1936, when the forged signature of Mr. Thomson was presented to the bank. The jury could

have fixed either date but apparently fixed the later date as one upon which sufficient facts and occurrences had accumulated to make it *certain* that the bank was put upon notice. The jury could on the facts presented have picked either date. The fact that the plaintiff accepted the jury's finding as to the date and did not cross appeal is of no moment. That does not remove from the case nor from the jury's consideration the occurrences of 1932 and 1933.

The learned Appellate Division held *as a matter of law* that it was Mr. Thomson's duty to examine the statements sent to his office by the bank and that his failure to do so barred recovery. We think that that cannot be said here to be so as a matter of law. That was clearly a question of fact. Mrs. Roberts was committing suspicious acts in 1932 and in 1933 and was told by a responsible bank officer to stop them. In 1936 she presented a patently forged signature of her principal which was not in accord with the power of attorney given to her. At those times the credit file memorandum made by Mr. Hovey showed that Mr. Thomson was " not in good health and spends practically all of his time away from the city ". The same memorandum described Mrs. Roberts as the person " who takes care of both Mr. and Mrs. Thomson's affairs ". The bank knew that Mrs. Roberts was in charge of Mr. Thomson's office and that he rarely attended there. Therefore the bank knew that it was sending to Mrs. Roberts, who was committing the suspicious acts, the periodical statements and putting it within her power if she were doing wrong to conceal those statements from her principal. One would hardly expect that recovery would be denied to a depositor *as a matter of law* because the bank put periodical statements into the hands of an agent acting suspiciously who would have every motive to suppress them. Certainly no one would contend that that was the law if the bank actually knew that the agent in charge of the office was concealing the statements from her principal. If there came a time when the defendant was put on inquiry as to whether this agent was acting within her authority the same rule of law obtains.

There is another reason why the failure to examine the bank's statements could not defeat the plaintiff *as a matter of law*. A depositor's failure to examine the statements only gives the

bank a set-off for damages caused by the *depositor's negligence.* If the bank itself was negligent, the set-off is lost and we return to the contract which was breached. (*Critten* v. *Chemical Nat. Bank,* 171 N. Y. 219; *Irving Trust Co.* v. *National City Bank of New York,* 78 F. 2d 665.) The facts which put the bank on notice that Mrs. Roberts was exceeding her authority established its subsequent negligence in not acting upon that notice. It is difficult to see how it can be said *as a matter of law* that the bank was not negligent in failing to make inquiry when the assistant vice-president in charge of the accounts both of the principal and the agent became so concerned with the agent's conduct that he warned her to stop the conduct but took no steps to warn the principal nor even to make inquiry himself as to her authority. Before that warning to Mrs. Roberts she had drawn checks on her own account resulting in overdrafts at the rate of one hundred times in two and a half years and had replenished her account from that of her principal so often that she was told to stop it. It makes no difference since we are discussing this as a matter of law and not as one of fact, that it is claimed that Mrs. Roberts paid some bills of Mr. Thomson from her own account. That may be matter of defense. The fact is that whether or not she had paid such bills defendant's officer was so aroused by the acts of the agent that even though the credit file told him that she was not to be disturbed (if that is what the credit file means) he told her to cease her practices. That could only have been because he feared that since there was no express authority in the power of attorney to Mrs. Roberts giving her the right to draw checks on her principal's account to her own order, there might be some liability upon the defendant bank if she continued to do so. That a jury could not say that that officer was guilty of negligence when that was his state of mind and he made no inquiry as to whether she was acting without authority is difficult to see. If it was negligent, it offsets the negligence of Mr. Thomson in not examining his periodical statements and entitled the plaintiff to recover for breach of contract. The additional negligence in sending the periodical statements to an office where the defendant knew they would come into the hands of Mrs. Roberts whose every effort might be to suppress them makes this case stronger than *Critten* v. *Chemical Nat. Bank* (171

N. Y. 219). See, also, *Gutfreund* v. *East River Nat. Bank* (251 N. Y. 58); *Basch* v. *Bank of America Nat. Trust & Savings Ass'n* (139 Pac. 2d 1, 12); *Irving Trust Co.* v. *National City Bank of New York* (78 F. 2d 665), where *Critten* v. *Chemical Nat. Bank* and the rule therein laid down was referred to. See, also, *Fidelity & Cas. Co.* v. *Farmers Nat. Bank* (275 N. Y. 194).

The case of *Potts & Co.* v. *Lafayette Nat. Bank* (269 N. Y. 181) is clearly distinguishable. There was no evidence that the bank was negligent. The conversions and the failure of the bank to discover them were due to the acts of a dishonest officer. For those acts and that knowledge the bank could not be held responsible. Here, however, the knowledge of the assistant vice-president and other officers of the defendant as to the conduct of Mrs. Roberts was knowledge gained while acting within the scope of their employment and so was imputable to the defendant. To say that the bank was not negligent *as a matter of law* and therefore did not lose its right of set-off was clearly error. That was a jury question. A bank may not be negligent and escape liability therefor *as a matter of law* by throwing the burden of checking its conduct upon its depositor and be absolved as a matter of law if the depositor fails to examine his periodical statement. On the contrary, the rule of the *Critten* case is that a bank shall not be excused by the depositor's negligence if it was also negligent. Questions of negligence are questions of fact.

Finally, as the dissenting judge below pointed out, the question of whether the failure to examine bank statements under the circumstances disclosed here constitutes negligence is one of fact and for jury determination. (*Frank et al.* v. *Chemical Nat'l Bank of N. Y.*, 84 N. Y. 209.)

The judgment should be reversed and a new trial ordered, with costs to abide the event.

THACHER, J. (dissenting). I concur in the opinion of Judge CONWAY and dissent from the opinion of the court,— particularly from its interpretation of the jury's verdict as precluding consideration of any transactions prior to November 18, 1936, as having any bearing upon notice to the defendant on that date that the decedent's agent was acting in excess of her powers. The circumstances which the jury found sufficient to

put the defendant upon inquiry were cumulative in effect and were all known to the officer of the bank who had charge of the account. The clumsy forgery on November 18th, coupled with the prior replacements of overdrafts from the agent's personal account by her withdrawals from her principal's account, were regarded by the jury as sufficient to put the defendant upon inquiry, and inquiry would have disclosed the fraud. The force of these circumstances is not dispelled by her authority to sign the note as agent. Accordingly, the evidence was amply sufficient to sustain the verdict.

LEHMAN, Ch. J., LOUGHRAN and DESMOND, JJ., concur with LEWIS, J.; CONWAY, J., dissents in opinion in which RIPPEY, J., concurs; THACHER, J., dissents in separate opinion.

Judgment affirmed.   (See 293 N. Y. 751.)