Henry Epstein, J.
This is an action for an accounting, to compel turnover of property and for damages allegedly due on such accounting. Defendants are the former husband of plaintiff, his brother, a member of the stock brokerage firm of Hornblower & Weeks, also a defendant. The wife of the broker (Licia Albanese, wife of Joseph Gimma) is also a defendant. The transactions on which the claims of plaintiff are based cover a period from 1946 to 1954. Since Joseph Gimma was first a customers’ man and later a partner in defendant, Hornblower & Weeks, the claim of a fiduciary relationship is is made. Separate causes of action are stated against defendant Mario Gimma (the ex-husband of plaintiff) for unrepaid loans, failure to support and for conversion of a Cadillac automobile.
*701 The verified answers constitute general denials, with pleas of Statute of Limitations as a partial defense, and a counterclaim by defendant Mario Gimma as well as a defense based on a Florida divorce decree by plaintiff against said Mario Gimma (procured by plaintiff in 1954). The typewritten record of this case comprises over 3,000 pages and the court has received some eight or nine briefs from the parties which have been helpful. While there has been much said on both sides of the controversy, analysis reveals no great dispute on the facts deemed vital to decision. Pretrial examinations exposed almost all the documentary evidence produced at the trial. A review of certain facts will clarify the analysis moving the court to its conclusion.
Plaintiff, Dorothy Sica, was in 1946 a widow with substantial means inherited from her husband. An attractive woman in her middle years, she was “in the market ” for a husband and her friends were cognizant of this frame of mind. Over the Labor Day weekend in 1946, Mario Gimma, associated with Lawrence Turnure-BIyth Bonner brokerage firm, was procured as an escort for plaintiff. Mario Gimma was then living with his parents in Piándome, Long Island, not far from plaintiff’s residence — and he was then living separate and apart from his wife. There is little doubt that this was a fortuitous meeting for Mario Gimma — a fortune hunter, and an unfortunate one for Dorothy Sica, who so readily succumbed to Mario’s blandishments. If she had any sound sense of either men or money, they were wholly submerged in her eagerness to find a husband. Mario had done a rather finished job of “ casing” both the customer and the house. Both were to his liking and he acted with despatch.
At first plaintiff followed Mario’s recommendations and purchased 200 shares each of International Telephone, Electric Bond and Share, Electric Power and Light, and International Hydro-Electric A. The cost was $11,550.56, and when the confirmations were received from the Lawrence Turnure firm, plaintiff brought out a batch of 10, 20 and 100 dollar bills and counted out $12,485 which she handed to Mario. This included an item of $917.13 representing 50 shares of I. T. & T. purchased for Julie 'Chieco, plaintiff’s sister-in-law. This substantial cash sum came out of a $20,000 fund kept by plaintiff in cash in her bedroom. All this plaintiff desired to be kept secret from her brother-in-law, who handled the estate of her deceased husband and the business in which they had been associated. Thus began the friendly, frequent and continuous relationship of plaintiff and Mario. So sure was he of his *702 prospective bride and customer that Mario unhesitatingly told her of his domestic troubles, his meager income from earnings, and his very limited trading account at Credit Suisse. ' Again on October 4, plaintiff purchased from the Trunure firm through Mario an added 300 shares of I. T. & T., and paid by check for $5,584.26 on her Port Washington (L. I.) bank, to which sum was added the credit balance of $17.13 left from the prior transaction.
A second phase of the financial history now began: — Out of their increasingly friendly relationship came a joint trading in the Credit Suisse account to which plaintiff through Mario contributed 200 shares each of Electric Bond and Share and Electric Power and Light and 100 shares of I. T. & T. Mario then opened a checking account for himself in the Underwriters Trust with $4,500 taken from Credit Suisse as a loan. He drew a check for $3,000 to Dorothy’s order which she herself deposited in her own account. Additional shares were purchased and delivered to plaintiff from the Turnare firm. All this occurred in the period between September and December, 1946. Mario was now well on his way. The securities purchased from Turnure were handed to Mario and by him pledged at Credit Suisse. Before the summer of 1947 loans were made by Mario and in all this plaintiff’s name did not appear. However, she never complained and it would seem she was kept informed of such transactions.
By this time (early in 1947) plaintiff and Mario were “in love ” and saw each other every evening. They were planning marriage as soon as the obstacle (Mario’s wife) could be overcome. Mario then learned through friends that he could obtain a divorce in Georgia after a year’s residence. With the resources supplied by plaintiff the purchase of a night club restaurant in Darien, Georgia, known as the “ Ridgeway ” was effected for $15,000, all cash. Arrangements were made through Joseph, Mario’s brother, to obtain the needed funds with a loan from Credit Suisse in the name of Licia, Joseph’s wife. The collateral (plaintiff’s bonds to the amount of $15,000) was deposited on June 6, 1947. Also during this interval Mario brought plaintiff and her daughters to meet his and Joseph’s parents. When the closing on Ridgeway was imminent Joseph and his wife Licia had gone to Europe. Plaintiff then gave to Mario $10,000 United States Treasury bonds on which Mario obtained an $8,000 loan from Credit Suisse. The deal for Ridgeway was closed in August and Mario opened his own account in the Darien, Georgia bank. Title to Ridgeway was taken by plaintiff in her own name. She was not wholly devoid *703 of some sense of self-protection. And further to safeguard her funds from any claim by Mario’s wife, the account was set up as Licia Albanese account No. 2 in Credit Suisse. This was handled by Joseph at the request of plaintiff and with Licia’s consent. We are now in August (20), 1947 and the $15,000 in government bonds, formerly in the Licia regular account at Credit Suisse were transferred to the Licia No. 2 account. In none of these matters was defendant Hornblower & Weeks involved.
The Ridgeway investment proved unprofitable and except for providing Mario with a residence for purpose of his divorce, it yielded nothing but a living for Mario and a place to visit for plaintiff. The romance did, however, continue and in 1948 Mario and plaintiff came to New York, where she deposited $15,000 more United States Treasury bonds (plaintiff’s property) with Hornblower & Weeks, drew down the proceeds of $12,000 which Mario deposited in the Darien bank. Mario and plaintiff were now in the shrimp business. First one boat, then a second boat was bought for something like $20,000. These, too, were in plaintiff’s name. There was some anchor to windward. In October, 1948, Mario had his divorce from his wife. Plaintiff and Mario filed joint tax returns for 1949. They were not married until March, 1950. Prior to the ceremony Mario gave plaintiff a full release of all claim to her estate. Once more plaintiff shows a modicum of self-protection. The shrimp business was now transferred to St. Augustine, Florida (late 1949) and was discontinued in January, 1950. The proceeds of the sale of the boats were paid to plaintiff, who then built a home in St. Augustine, where she and Mario lived until June, 1952.
While living in St. Augustine, the St. Augustine National Bank carried a joint account of plaintiff and her husband Mario. All dividends, the proceeds of loans, etc., went into this account. In the Summer of 1951 Mario and plaintiff travelled in Europe. Strained relations began to show but were relieved. One source of irritation was removed by a settlement of all claims of Mario’s first wife for $12,000 which plaintiff loaned to her husband (Aug., 1952). By the late Fall of 1952 plaintiff had already consulted an attorney regarding a possible divorce. Reconciliation took place and their joint checking account continued. Mario continued to handle plaintiff’s fiscal affairs and gave her his note for the loan with which he had settled his first wife’s claims. In June, 1952 husband and wife returned to New York and in the Summer set up in an apartment at 60 Sutton Place South. Mario borrowed from Joseph money *704 needed for a partnership in Ver ace & Co. He went on a short business venture to Palm Beach, Florida, for his firm in the early months of 1953. The St. Augustine bank was still used for their joint funds. Dispute followed dispute until finally Mario was ordered out of plaintiff’s Sutton Place apartment in February, 1954. In March, 1954 plaintiff began divorce proceedings in Florida and on repayment of the $12,000 note, plaintiff obtained an uncontested decree (Mario appearing by counsel) on April 3, 1954. Thus ended both business and domestic relations of husband and wife.
At Credit Suisse the Licia No. 2 account had been set up in August, 1947. At a conference with Joseph, the latter sought to dissociate his wife’s name from the obvious struggle between Mario and plaintiff. Plaintiff in June, 1952 sent her check, signed in blank, drawn on the St. Augustine account, via Mario, to Joseph in the sum of $19,234.88. This was used to clear the Credit Suisse account and the securities (800 shares of Robert Gair and 900 shares of Electric Bond and Share) were delivered. The original 300 Electric Bond and Share were now 900 shares and the other securities had been transmuted into the Robert Gair. Plaintiff gave Mario as his “ cut ” 200 shares of Electric Bond and Share. There was some risibility in evidence, but it subsided. The remaining securities were given over to Joseph to place in plaintiff’s account with Hornblower & Weeks. Analysis of the accounts at Credit Suisse and at Hornblower & Weeks shows that plaintiff received back all the property that went into these accounts. The first Credit Suisse account was in Mario’s name. When it was closed out the debit balance was paid off out of a loan against the Licia No. 2 account which ran from 1947 to 1952. Plaintiff never gave Mario authority over or power of attorney for the Hornblower & Weeks account, which she maintained from 1948 until July, 1954. All regular monthlv statements were sent to plaintiff.
Into the Hornblower & Weeks account plaintiff put $122,350.66 capital. In six and one-half years she made capital withdrawals of $80,340.92 and received $55,336.83 dividend income. When closed in 1954 her securities were worth $334,900 and she had a net equity of $210,572. This was not a bad investment record. The only means by which plaintiff seeks to involve Hornblower & Weeks is through the fact of Joseph Gimma beinsr a partner therein. Yet the Hornblower firm treated plaintiff as it did other customers. It sent her written confirmation of all purchases and sales for her account; sent her monthly statements of all transactions, drew checks on her account only to her order. Periodically plaintiff confirmed the Hornblower & Weeks *705 auditors’ statements; she indorsed all checks drawn to her order with her signature and never complained to the firm about any transaction or about her account. Plaintiff cannot now be heard to complain of the Hornblower & Weeks’ actions. The statements rendered to her were as effective as bank statements for the purpose of giving notice of all transactions and asking for errors, if any. (Thomson v. New York Trust Co., 293 N. Y. 58.) On examination before trial plaintiff was asked:
“ Q. You realize you have no claim against Hornblower & Weeks. Do you not?
“ A. I have a claim against Joseph Grimma and not Hornblower & Weeks.”
Plaintiff’s attempt to translate into claims against Hornblower & Weeks the checks cashed as accommodation for her by the brokerage firm must also fail. They were drawn by Mario, her husband, on an account in a bank on which he had the right to draw checks. Guild v. Hopkins (271 App. Div. 234) is close enough to cover the transactions here involved. The instant facts are more conclusive against plaintiff than in said case. No cause of action is made out against Hornblower & Weeks. Were it necessary to discuss the six-year and threevear Statutes of Limitations, it would appear that both operate against plaintiff on the transactions prior to 1948 and thereafter. (Keys v. Leopold, 241 N. Y. 189, 193; Coane v. American Distilling Co., 298 N. Y. 197, 206.) This decision is, however, based upon the analysis hereinabove set forth and is arrived at without applying said statutes as defenses.
A wife who gives carte blanche to her husband to use her funds for either their personal use, for household purposes or for himself cannot, when their paths have separated, compel him to account. (T. G. W. Realties v. Long Is. Bird Store, 151 Misc. 918, 919-922 [Rosenman, J.].) Plaintiff in the instant case stands in no better position than in the case cited, a seemingly well-established principle. (Spalding v. Spalding, 361 Ill. 387, 388-395; Manufacturers Trust Co. v. Gray, 278 N. Y. 380, 383-386; Brell v. Brell, 143 Md. 443.)
While the court is inclined to believe that the argument, on the basis of the Florida divorce relieving Mario of any obligation theretofore, is sound (see Cooper v. Cooper, 69 So. 2d 881, 883-884 [Fla.]), the evidence does not warrant any finding in plaintiff’s favor even without this defense. He was her husband and she entrusted her fiscal matters largely to him at her peril. There are many possible unforeseen consequences of a marriage for which the courts can afford no relief. Misplaced trust in a husband is one of these. Guild v. Hopkins (271 App. Div. 234, *706 affd. 297 N. Y. 477, supra) is as available to defendants Joseph, Licia and Mario as it is to Hornblower & Weeks. Nor can the husband be held for expenditures out of a wife’s funds for necessaries. She herself supplied these funds and placed no restrictions on her husband’s expenditures. (Manufacturers Trust Co. v. Gray, 278 N. Y. 380, 383-386, supra; Third Nat. Bank v. Guenther, 123 N. Y. 568, 572-576.)
The cases cited by plaintiff’s counsel in the extensive briefs have been carefully considered. They do not strike this court as persuasive on the facts in this case. Neither defendant Hornblower & Weeks, nor defendant Joseph Gimma did anything as agents which was outside of plaintiff’s knowledge or that of her trusted representative, Mario, her husband. No proof of fraud, attributable to defendants Hornblower & Weeks, Joseph Gimma, Licia Albanese (Gimma) is discerned. There was no conscious concealment by them. We need go no further for the authority placed in Mario by plaintiff than paragraph “6” of the complaint wherein full authority to Mario is set forth — and this was thoroughly borne out in the proof. Nor can section 19 of the Civil Practice Act toll the Statute of Limitations for plaintiff in the light of the facts revealed in this case. No unavailability of Mario for service is shown. (Fowler v. Hunt, 10 Johns. 464; Turner v. American Metal Co., 268 App. Div. 239.)
The recent case of Zolli v. Zolli (8 Misc 2d 582, 583-585) adds strength to the conclusions reached herein, which accord with Guild v. Hopkins (supra).
On a thorough review of the facts and a careful survey of the applicable statutory and case law, the conclusion is inescapable that plaintiff has failed to make out a case. Complaint dismissed. The counterclaim of defendant Mario Gimma is also dismissed. Submit findings, conclusions and judgment not inconsistent with the foregoing.