Cohn, J.
This action was brought to require appellants as partners of the stock exchange firm of Herrick, tBerg & Company (hereinafter called “ Herrick Berg ”) to account for all property received from respondent and to account for all transactions in connection with the operation of a margin account which they maintained in respondent’s name from June, 1929, to June, 1938.
The complaint alleges that the account was a discretionary one; that respondent authorized Herrick Berg to execute such orders to buy and sell as in the discretion of Charles F. Guild (who is respondent’s son) should be for respondent’s best interests. The complaint then sets forth numerous allegedly wrongful transactions in connection wdth respondent’s account, of which she claims to have had no knowledge. In substance, it charges that cash and securities were transferred out of her account to third persons to whom respondent was not indebted; that securities belonging to her were used as collateral for margin accounts maintained with Herrick Berg in which respondent had no interest; that Charles F. Guild purchased certain stocks for himself and thereafter transferred such purchases to her account when the market price dropped; that without authority her assets were used to protect the trading accounts of Charles F. Guild; that upon dissolution of the firm neither securities nor cash were returned to respondent and that appellants have refused to account.
The answers of appellants plead a general denial coupled with affirmative defenses of the statute of limitations, account stated, and negligence on the part of respondent in failing to examine the monthly statements sent to her agent by Herrick Berg.
*238 The trial court held that the authority of Charles F. Guild as attorney in fact for respondent was limited to the purchase and sale of “ conservative investments.” The court also ruled that as to the transactions complained of, Charles Guild exceeded his authority; that the other appellants knew or should have known that he had no authority to execute these transactions as respondent’s agent; that the partners of Herrick Berg, other than Charles Guild, were responsible for his torts which were found to be within the scope of his authority as a partner; that respondent did not discover the wrongdoing of appellants until the year 1940 and that the statute of limitations was no bar because the- cause of action did not accrue until the wrongdoing was discovered. In granting judgment for respondent, the court directed an accounting of all transactions for respondent’s account “ from June 10,1929, to date.”
At the time of the trial respondent was eighty-one years of age. She is obviously an intelligent and well-educated woman. For some years prior to 1920, with the aid and advice of an uncle, she had managed her own business affairs. She has two sons. The elder, Henry J., is a reputable businessman who has been and still is a director of many nationally known corporations. The younger son, Charles, one of the appellants here, has always been in the stock brokerage business. Respondent had the utmost confidence in the integrity and business judgment of her son Charles and trusted him implicitly. She also 'had full faith in her son Henry, with whom she has resided since 1928, and whenever she entertained any concern over her investments and business affairs she would also consult him.
In 1920, when Charles was but twenty-four years of age, respondent turned over to him $106,000 in cash to invest, as she testified, “ in very conservative securities ” and $91,000 in securities to manage. At that time she gave him a power of attorney which, according to respondent, merely authorized him to buy and sell securities for her and to make such changes in the investments from time to time as should in his discretion seem advisable. Charles, on the other hand, testified that by the terms of this power he was also authorized to make loans and to borrow money and personally to withdraw securities and cash. His testimony as-to the extent of the power was largely substantiated by respondent’s own testimony.
*239 Acting on the power of attorney received in 1920, Charles opened an account for his mother with Bond & Goodwin, a Boston brokerage house where he was then employed. He received all confirmations and monthly statements from this firm because respondent did not wish to be bothered with any notices. In 1923, Charles left the employ of Bond & Goodwin and transferred his mother’s account to another Boston house, Townsend, Anthony & Tyson, (hereafter called “ Townsend Anthony ”), which account he continued to operate for his mother until 1929.
The transcripts of respondent’s accounts with Townsend Anthony during the period from 1923 to 1929 reveal that stocks as well as bonds were bought and sold for her account, including participations in syndicates, and that securities were transferred from her account to her son Henry’s account and her son Charles’ account. These transcripts .also disclose that vouchers for large sums of money were drawn from respondent’s account and were made payable to the order of Charles and in some instances to the order of Henry.
In 1928 Charles borrowed $35,000, using respondent’s negotiable securities as collateral. This sum he contributed to Townsend Anthony as capital when he became a partner in that firm. Respondent testified that Charles did not tell her of the transaction when it occurred and that she learned of it after the loan had been made. She made no inquiry to determine whether Charles had repaid the loan nor did she know for how long a time her securities had been borrowed. When asked at the trial whether she had made any investigation about this loan, respondent testified that she had not, because she “ would trust him [Charles] anywhere.”
On March 31, 1926, respondent executed and delivered to Charles a second power of attorney to borrow money, sign checks, and to sell, pledge or exchange securities. This power was submitted to Townsend Anthony.
We now come to the period involved in this litigation. In May, 1929, Charles left the firm of Townsend Anthony and associated himself with Herrick Berg in New York City. He became office manager of that concern. While acting in that capacity on June 10, 1929, he opened a margin account for respondent in which securities were bought and sold pursuant to his orders. Respondent claims that securities in excess of $200,000 were then delivered by her to Herrick Berg through her son. The following March, Charles became a partner. *240 Shortly after the transfer of his mother’s account to Herrick Berg, Charles filed with the latter the 1920 power of attorney which he had received from his mother. This document was lost and could not be produced at the trial, although concededly it existed and had been left with Herrick Berg.
Charles alone directed respondent’s financial matters while she had an account at Herrick Berg. At no time did he discuss with any of the partners the purchase or sale of securities for his mother’s account. The commitments Which Charles made in her behalf while he was associated with Herrick Berg were more speculative than they had been theretofore. The manner in which Charles managed her account, too, doubtless was contrary to the private understanding had with his mother and violated the confidence she reposed in him. Thus, in July, 1929, Charles ordered the transfer of bonds in respondent’s account to one which he had opened in his own name; in the fall of 1929, allegedly for his own purposes, he operated a so-called-“ Mrs. Ella F. Guild, No. 2 Account in the spring of 1930 he used $37,000 of his mother’s securities, which he obtained from a safe deposit box under his control, for the purpose of securing a loan of $27,000 from the Chase National Bank, from the proceeds of which he paid his capital investment of $25,000 to Herrick Berg; in 1930 and 1931, he engaged in stock and syndicate operations involving a new enterprise known as General Theatres Equipment Company which resulted in disastrous losses to his mother; and in April, 1931, he caused a merger of his own accounts and those of his brother, Henry, with the main account operated in the name of his mother, which merger is alleged to have converted a credit balance in respondent’s account into a debit balance.
It appears, .from respondent’s own testimony, her letters and the claim she made in her complaint in this action and in a prior suit which she had brought against Charles, that there was no limitation whatever upon Charles ’ authority to buy and sell securities. The trial court, we think, was in error when it held that Charles * authority was limited to buying and selling “ investments ” of a conservative nature. The words “ conservative ” and “ investments ” have no precise definition in law and a limitation as vague as this upon the authority of the agent is here meaningless. Moreover, a holding that Charles ’ authority was restricted to buying and selling “ investments,” was contrary to the purport of the 1926 power of attorney which expressly authorized Charles “ to invest and *241 reinvest * * * in such bonds, stocks or other securities * * * as my said attorney may determine ”.
It is to be observed that when Charles’ authority to deal for the plaintiff’s account was questioned shortly after he affiliated himself with Herrick Berg, he produced the 1920 power, although at that time he also had the 1926 power. If his authority under the 1920 power were more restricted than his authority under the 1926 power, it is reasonable to assume that he would have filed the 1926 power. The only logical inference to be drawn is that the 1920 power was at least as broad as the one executed in 1926.
On August 14, 1931, after the completion of practically all transactions of which she now complains, respondent, at the request of Charles, gave him a . third power of attorney which was addressed to Herrick Berg. The two earlier powers were general and were not addressed to any particular firm or person. Charles sent the 1931 power to respondent at Watch Hill, Rhode Island, with a letter requesting her to sign it. She did so and thereupon forwarded it to her son Henry, who in turn remitted it to Charles. It was then filed with Herrick Berg’. Neither the 1931 power nor the two earlier ones were revoked by respondent until 1943. Because of its importance to the issues involved, we quote the third power of attorney in full. It reads:
“ Herrick, Berg & Co.
40 Wall St., New York Dear Sirs:
I hereby authorize Charles F. Guild to buy, sell including short sales and trade in, for my account and risk and in my name, stocks, bonds and any other securities and/or commodities on margin or otherwise and in accordance with your usual terms and conditions; and I hereby agree to indemnify and hold you harmless from and to promptly pay "you on demand any and all losses arising therefrom or debit-balance due thereon. You will kindly follow his instructions in every respect concerning my account with you, and make payments of moneys and deliveries of securities to him or otherwise as he may order and direct. In all matters and things aforementioned he is authorized to act for me and in my behalf in the same manner and with the same force and effect as I might or could do.
I hereby waive notification to me of any of the aforementioned transactions and delivery of any statements, notices or *242 demands pertaining thereto and hereby ratify any and all transactions heretofore or hereafter made by him on or for my account.
This authorization is a continuing one and shall remain in full force and effect until receipt from me of written notice of my revocation thereof.
Ella Frances Guild
Dated August 14, 1931 ”
In 1932, respondent learned that she had suffered severe losses in her investments but she continued to rely solely upon Charles and made no inquiry of Herrick Berg. Respondent testified that she was disturbed about her financial condition; that every time she saw Charles she asked bim for a statement which repeatedly he promised to give her, but none was forthcoming; and that she asked Henry to check up on Charles and to obtain a statement from him. On June 14, 1930, Charles wrote his mother: “ The last time I took account of stock, you had about $230,000 outside of your real estate.”
Two years later Henry met Charles at a hotel in New York. Concededly Henry was deeply interested in preserving his mother’s property. At this meeting Charles wrote out from memory a list of respondent’s securities which list he delivered to Henry. There was no indication as to whether the securities listed were in her margin account with Herrick Berg, in her safe deposit box, or pledged for loans. Neither the market price nor the cost of the securities was set forth. Some of the securities were highly speculative and others were worthless. Later Henry wrote on the list “ Total $189,000 ” and the figure “ $750 per month. ’ ’ Henry admitted that he could not tell from what source he obtained these figures and that he made no attempt to evaluate the securities or to ascertain the amount of income they yielded. In fact these securities had a market value at that time of only $68,000.
Respondent, in 1932, was much concerned because the valuation of $189,000 Henry had put upon the securities was $41,000 less than the valuation Charles had given her in his letter of June 14, 1930. At respondent’s request Henry communicated with Charles for an explanation of this difference. Charles did not reply and six months later Henry wrote again. Still Charles ignored the inquiry. Respondent took ho step to protect her interests, nor did Henry. In the period in question, Henry came to New York several times a month and called *243 at the offices of Herrick Berg at least half a dozen times a year.
Between 1920 and 1929, Charles would deposit at irregular intervals all dividends from stocks and interest coupons from bonds in a bank account of plaintiff in Boston. Later, after Charles moved to New York, he would transmit monthly to his mother’s account at the Old Colony Trust Co. in Boston round sums, first in the amount of $1,200, then in smaller sums and, in 1940, he ceased making any deposits. The aggregate amount of these deposits for the period from 1932 to 1940 was, according to Charles, $78,299.98.
Herrick Berg went out of business on January 31, 1938. At that time respondent’s account had a debit balance .of $251.12 and her account was long of securities of doubtful value. Charles paid the debit balance and took delivery of the securities in his mother’s account. After the .winding up of Herrick Berg’s affairs, Charles nevertheless continued to make deposits in his mother’s account at the First National Bank in Boston until July, 1940. In that month Charles told his brother Henry that all of his mother’s securities had been lost because of his improvident speculations in her accounts and in his own. The next year, • respondent brought suit against her son Charles, demanding an accounting and damages. The action was discontinued because respondent, according to her counsel, believed Charles was hopelessly insolvent and because she did not wish to sue her own son. Late in 1942, she instituted the present action. Originally Charles was not made a party to this suit. He and appellants Royal Little and Eliot Farley voluntarily intervened as parties defendant. Respondent then served a second amended complaint joining them as parties defendant. The complaint, as amended, asserts no claim against Charles personally, the only relief demanded against him being that he account as a partner of Herrick Berg.
We think that respondent’s cause of action is barred by the statute of limitations. Respondent elected to bring a suit in equity for an accounting because of the fiduciary relationship existing between her and appellants as customer and broker. Accordingly, she urges that the ten-year Statute of Limitations is applicable. (Civ. Prac. Act, § 53.) However, the basis of respondent’s action is breach of contract and conversion. This, the complaint itself clearly indicates. It specifically alleges that respondent entered into an agreement with Herrick Berg whereby she employed them as brokers to buy and sell securities for her and that the brokers in violation *244 of the agreement wrongfully permitted Charles to withdraw cash and securities from her account for his own use.
An action at law to recover damages for breach of contract and for conversion would have furnished respondent a complete, and adequate remedy. Instead of pursuing her remedy at law, respondent, as she had the right, resorted to a suit in equity for an accounting. By invoking the jurisdiction of equity respondent would not' thus be entitled, to a greater period within which to bring the action- than is provided by the statute of limitations applicable to the concurrent legal remedies. (Keys v. Leopold, 241 N. Y. 189, 193; Geris v. Halsey, 250 App. Div. 297, 300; Cohen v. Hughes, 38 N. Y. S. 2d 874, 876, affd. 266 App. Div. 658, affd. 291 N. Y. 698.) The suit is governed by the six-year Statute of Limitations applicable to actions-, to recover damages for breach of contract (Civ. Prac. Act, § 48, subd. 1) and the three-year statute applicable to actions for conversion (Civ. Prac. Act, § 49, subd. 7).
A cause of action for breach of contract or conversion accrues when the breach or the conversion" occurs and the statute then begins to run. Respondent’s cause of action accrued as each wrong occurred, whether- the wrong involved was a breach of contract or a conversion. (Model Building & Loan Assn. v. Reeves, 114 Misc. 137, 142, affd. 236 N. Y. 331; Pollack v. Warner Bros. Pictures, Inc., 266 App. Div. 118, 120; Braunwarth v. Wellington, 48 N. Y. S. 2d 159, affd. 269 App. Div. 747, leave to appeal denied 294 N. Y. 639.)
Nor does the existence of a cause of action depend»' upon respondent’s knowledge that she has suffered an injury. That she may not have discovered the wrongs complained. of until long after they" we're committed is immaterial. (Brick v. Cohn-Hall-Marx Co., 276 N. Y. 259; Wood v. Young, 141 N. Y. 211, 217; Wakulaw v. State Bank, 214 App. Div. 673, 677.) “ Except in cases of fraud where the statute expressly provides otherwise the statutory period of limitations begins to run from the time when liability for wrong has arisen even though the injured party may be ignorant of the existence of the wrong or injury.” (Schmidt v. Merchants Despatch Trans. Co., 270 N. Y. 287, 300.) The only exception to the.rule that lack of knowledge does not postpone the accrual of a cause of action is to be found in section 48, subdivision 5, of the Civil Practice Act which provides “ An action to procure a judgment on the ground of fraud * * * is not deemed to have accrued until the discovery by the plaintiff * * * of the facts constituting the fraud.” The trial court here specifically held that this *245 is not an action to procure a judgment on the ground of fraud. With that finding we are in accord. Respondent’s cause of action arose when the wrongs complained of occurred and respondent’s ignorance thereof in no way affected the accrual of her right of action.
Moreover, the trial court’s finding that the wrongful acts upon which respondent predicates her right to an accounting were concealed from respondent until 1940 is not sustained by the evidence. The delivery of monthly statements to Charles was authorized by the powers of attorney entrusted to him by respondent, and was acquiesced in by her during all the intervening years. In any event it is immaterial whether or not there was concealment. Mere concealment does not affect the accrual of a cause of action nor toll the statute of limitations. (Glover v. National Bank of Commerce, 156 App. Div. 247, affd. 219 N. Y. 618; Gobel, Inc., v. Hammerslough, 263 App. Div. 1, affd. 288 N. Y. 653.)
The trial court found that respondent’s cause of action comes within subdivision 1 of section 15 of the Civil Practice Act and that, therefore, the cause of action did not mature until 1942 when respondent made a demand for an accounting. Section 15 of the Civil Practice Act, so far as pertinent, provides:
*■ Where a right exists, but a demand is necessary to entitle a person to maintain an action, the time within which the action must be commenced must be computed ’from the time when the right to make the demand is complete except in one of the following cases:
u 1. Where the right grows out of the receipt or detention of money or property by an agent, trustee, attorney, or other person acting in a fiduciary capacity, the time must be computed from the time when the person having the right to make the demand has actual knowledge of the facts upon which that right depends.”
That section, in our view, has no application to the case at bar because (1) no demand was necessary to perfect respondent’s cause of action, and (2) respondent’s cause of action does not come within the scope of subdivision 1 of section 15 of the Civil Practice Act. By its terms, section 15 applies only where “ a demand is necessary to entitle a person to maintain an action ”. No demand was necessary to entitle respondent to maintain her action here. Without a demand a cause of action existed. (Wood v. Young, 141 N. Y. 211, 217, supra; Mills v. Mills, 115 N. Y. 80, 86; Gleason v. Ritchie, 267 App. Div. 447, 449.)
*246 Subdivision 1 of section 15 of the Civil Practice Act is expressly limited to cases “ Where the right grows out of the receipt or detention of money or property ’ ’. In the case at bar respondent’s rights did not arise out of the receipt or detention of money or property. Her right grew out of appellants’ alleged breach of contract and alleged acts of conversion.
Furthermore the statute begins to run, not from the time the demand is made, but from the time “ when the person having the right to make the demand has actual knowledge of the facts upon which that right depends.” All respondent needed to know here to make a demand was that she had an account with Herrick Berg. This she knew. Respondent’s knowledge of the delivery of her funds to appellants was the actual knowledge of the facts upon which the right to make a demand depended. No other knowledge was required. (Adams v. Olin, 140 N. Y. 150; Brown v. Brown, 83 Hun 160, affd. 146 N. Y. 385.) Respondent’s cause of action arose without the necessity of a demand when the wrongs occurred.
Before September, 1938, the six-year Statute of Limitations applied to actions for conversion. (L. 1920, ch. 925; former Civ. Prac. Act, § 48, subd. 3.) Actions for conversion accruing thereafter are barred by the three-year statute. (L. 1936, ch. 558; Civ. Prac. Act, § 49, subd. 7.) This action was begun November 24,1942. The wrongs complained of, with the exception of a few withdrawals by Charles by checks made payable to his own order from respondent’s account with Herrick Berg totalling $2,008.79 occurred more than six years before the commencement of this action. The withdrawals made after November 24, 1936 (which was six years prior to the commencement of this action), were authorized by respondent and furnish no basis for any action against these appellants. They came- squarely within the August, 1931, power of attorney which commanded Herrick Berg to “ follow his [Charles’] instructions in every respect concerning my account with you,- and make payments of moneys * * * to him * * * as he may order and direct.” Herrick Berg, accordingly, was under no duty to challenge these withdrawals or to inquire as to their purposes. Unless it knew that they were made with the intent to misappropriate funds or were made' in payment of Charles’ personal obligations to the firm, Herrick Berg was bound to honor such payments. These withdrawals were not used to'pay Charles’ indebtedness to the firm. In the circumstances Herrick Berg was not liable for these payments. (Bischoff v. Yorkville Bank, 218 N. Y. 106,112: Carlisle *247 v. Norris, 215 N. Y. 400, 415.) Whether the wrongs complained of be regarded as acts of conversion or breaches of contract, all were outlawed by the statute of limitations.
We are of opinion, too, that respondent’s own negligence of her financial affairs and her complete acquiescence in the misconduct of her son Charles, who was her' agent, over a period of many years, preclude recovery by her. From the time that Charles associated himself with Herrick Berg in the year 1929, and even for years before, respondent, because of her implicit faith in the integrity of her son, permitted Charles to do whatever he pleased with her cash and securities without any supervision or inquiry as to his acts. From 1929 to 1938 Herrick Berg delivered' to Charles as respondent’s duly authorized agent, a written confirmation of each transaction as it occurred and also rendered monthly statements of her account. The trial court so found. The statements were duplicates of the ledger sheets of Herrick Berg by which respondent has sought to establish her claim that the transactions made for her account were wrongful. She never at any time questioned the correctness of the monthly statements. The fact that she did not personally receive these statements was something for which she was entirely responsible. In the August, 1931, power of attorney she specifically waived delivery of all statements, notices and demands as to any and all transactions. Respondent, however, was under a positive duty to obtain and examine statements of her account and report any errors or unauthorized transactions. Her failure to do so bars her recovery. (Thomson v. New York Trust Co., 293 N. Y. 58; Potts & Co. v. Lafayette Nat. Bank, 269 N. Y. 181; Empire Trust Co. v. Cahan, 274 U. S. 473.) In Potts & Co. v. Lafayette Nat. Bank (supra), at pages 189-190, the - court said: “Here, acquiescence was due solely to the negligence or wrong of the plaintiff’s own agent, and for such negligence or wrong the plaintiff was responsible." [Citing cases.] Thus the same evidence which the plaintiff produced to impeach the account stated, establishes the plamtiff’s negligence or wrong in failing to give notice of error in the account, and subjects the plaintiff to liability for damages caused thereby. Those damages are the exact amount of the diversions of the proceeds of the plaintiff’s cheeks; for the failure to give notice prejudiced the defendant’s rights to obtain restitution or indemnity in respect to loss previously suffered, and enabled the two dishonest employees to continue their fraud. ’*
*248 There is no evidence that the partners of Herrick Berg knew of Charles’ allegedly wrongful acts nor is there any evidence that they participated in any of them. The partners of Herrick Berg concealed nothing. They delivered accurate confirmations and statements to respondent’s agent and she may not now shift to her brokers the consequences of her failure to inform herself of what her son was doing. This duty she neglected to perform for all the years from 1929 to 1938, though she knew that Charles at previous times had used her funds and securities for his own benefit. Even in 1932 when respondent learned that Charles had given Henry information which indicated that she had sustained a loss of over $40,000, she omitted to make any independent investigation of Charles’ management of her business affairs.
When Charles became a member of the firm of Herrick Berg in March, 1930, respondent looked solely to him as her agent and not to the firm. Respondent vested Charles with absolute discretion by the powers of attorney she delivered to him. Herrick Berg had no right to invest her funds. Its sole duty was to obey Charles’ directions, and that it did. He always acted for her benefit or for his own and not for the benefit of the firm. The dissipation of respondent’s fortune in stock market speculations manipulated by her son Charles may have constituted a betrayal of respondent’s trust in her son for which the latter may be individually responsible. As against him respondent has elected not to pursue any remedy she might possess. The other partners of the firm may not now be held liable for any of Charles’ allegedly unauthorized acts made possible by the negligence of respondent.
In Empire Trust Co. v. Cahan (274 U. S. 473, supra), the Supreme Court refused to charge a bank with knowledge of the misappropriations by an adult son from his father where the son was drawing checks on his father’s accounts in two banks to his own order under an unlimited power of attorney given by his father. The court, Holmes, J., at page 479, said: ‘ ‘ The petitioner had notice that the checks were drawn upon the respondent’s account, but they were drawn in pursuance of an unlimited authority. We do not perceive on what ground the petitioner could be held bound to assume that checks thus lawfully drawn were required to be held or used for one purpose rather than another. * * * And when the two parties are father and son, both of mature years and in good standing, secret limitations of the power are a pure matter of speculation into which it seems to us extravagant to expect *249 the bank to inquire. The person reposing confidence in the son was not the petitioner but the respondent, National Safe Deposit, Savings & Trust Co. v. Hibbs, 229 U. S. 391, 397, and he himself tells us that his confidence was unlimited. He put his deposits absolutely into his son’s power; and the son, if he drew currency, as he might, could do with it as he saw fit. The notice to the bank was notice only of this relation of the parties. * * * But we do not place our decision upon that narrow ground. For in addition to what we have said, the transactions went on for over two years and the petitioner fairly might expect the respondent to find it out in a dionlh or two if anything was wrong. Careful people generally look over their bank accounts rather frequently.” And in Thomson v. New York Trust Co. (293 N. Y. 58, 68-69, supra), the Court of Appeals said (Lewis,'J.): “We think the Appellate Division was correct in its ruling that the decedent was under a legal duty to examine the monthly statements showing the condition of his acccounts, and that, in the circumstances disclosed by this record his failure to do so barred recovery in this action, * * * When in the present case the decedent chose to delegate that duty to another and entrusted to Mrs. Roberts the examination of monthly statements of his accounts, which were concededly furnished regularly by the bank, his estate may not now charge the bank with the loss which ensued and which was due to his misplaced confidence in his agent.”
It is our view also that the express ratification of “ any and all transactions heretofore or hereafter made by him [Charles] on or for my account ” (italics supplied) stated in the 1931 power of attorney, in the circumstances of this case binds respondent as to all prior transactions as well as to subsequent ones. She ratified in utter disregard of her duty to inform herself as to such transactions. Respondent had neither examined the monthly broker’s statements nor had she, as principal, checked, on the activities of her agent in any other way.
No proof was afforded that the respondent was ignorant of the nature of the instrument which she signed. She execute]! it with the knowledge and approval of her son Henry and thereafter she caused it to be delivered to Herrick Berg. The latter could properly assume that respondent understood what she was doing when she signed the power. Appellants relied upon it and no reason is suggested as to why respondent should not be bound by her own act. Respondent, therefore, *250 is estopped from denying ratification. “ The question of estoppel is one of ethics and is to- be1 enforced where in good conscience and honest dealing(it ought to be.” (Small v. Housman, 208 N. Y. 115, 123.) In their answer appellants set up that respondent gave to Charles powers of attorney in writing, that they followed his instructions, and that “ all transactions in plaintiff’s account were authorized by plaintiff or Charles F. Guild, her authorized agent.” As.all acts of Charles were at least purportedly authorized by his principal, it cannot be said that so far as Herrick Berg was concerned appellants violated their agreement with respondent by permitting Charles to execute transactions now claimed to be beyond the scope of his authority.
The record on appeal in this case includes a volume of exhibits numbering over 700 printed pages. Embraced therein are the Herrick Berg ledger sheets which disclose the daily transactions of all accounts involved. All information necessary to determine the issues between the parties is before this court. A further accounting in the particular circumstances of this case, we think, is unwarranted.
For the foregoing reasons we hold that respondent’s complaint should have been dismissed on the merits. The interlocutory judgment directing appellants to account should be reversed, with costs, and the complaint dismissed, with costs.
Martin, P. J., Townley and Glennon, JJ., concur; Dore, J., concurs in result.
Interlocutory judgment unanimously reversed, with costs, and the complaint dismissed, with costs. The findings inconsistent with this determination should be reversed and such new findings made of facts proved on the trial as are necessary to sustain the judgment hereby awarded. Settle order on notice.